UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROUMANN CONSULTING INC. and
RONALD ROUSSE,
           Plaintiffs,

  v.                                                    Case No. 17-C-1407

T.V. JOHN & SON, INC.,
           Defendant.

## DECISION AND ORDER

In this suit for breach of contract, plaintiffs Roumann Consulting Inc. and Ronald Rousse claim that defendant T.V. John & Son, Inc. ("TVJ"), failed to pay commissions and other amounts due under an employment contract and an independent contractor agreement. TVJ counterclaims, seeking a declaration that it owes no further payments to the plaintiffs. Before me now are the parties' cross-motions for summary judgment on TVJ's counterclaims.

## I. BACKGROUND

Roumann Consulting is a Canadian company that provides bidding and management services for construction projects. Ronald Rousse, a citizen of Canada, is Roumann's sole owner. TVJ is a construction general contracting firm that is organized under the laws of Wisconsin and headquartered in Wisconsin.

In late 2011, TVJ hired Rousse as an employee. At that time, Rousse had relationships with various "light commercial" construction customers, including The Kroger Company and Menard, Inc. By hiring Rousse, TVJ gained access to these customers and was able to expand its business in the light-commercial construction

market. Later, the parties decided to convert Rousse from an employee of TVJ to an independent contractor. Rousse formed Roumann Consulting, and on March 25, 2015, TVJ and Roumann entered into an independent contractor agreement.

Under the agreement, Rousse[1] was to pursue work for specific clients—Menards, Kroger, The Fresh Market, and L.A. Fitness—and assist with the management of construction projects for these clients. In exchange, TVJ agreed to pay Rousse an hourly rate and a commission of 30% of the net profits realized on each project.

The parties performed under the independent contractor agreement for some time. However, in August 2017, TVJ decided to terminate the agreement. The agreement provided that either party could terminate it "for any reason" on 30 days' written notice. Agreement § 4.1, ECF No. 17-1. The agreement drew a distinction between termination for "Willful Misconduct" and termination "for any reason other than 'Willful Misconduct.'" *Id.* § 4.2(b)–(d). Under the relevant provisions, if TVJ terminated the agreement for any reason other than willful misconduct, it was required to continue making commission payments to Rousse on projects related to his clients (*i.e.*, Kroger, Menards, etc.) that TVJ accepted either while the agreement was in force or during the two-year period following the agreement's termination. *Id.* § 4.2(b). If, however, TVJ terminated the agreement for willful misconduct, then Rousse was not entitled to post-termination commission payments. The agreement defined willful misconduct as "any act committed with an intentional, willful or wanton disregard of the Company's interests

---

[1] Although the agreement was technically between TVJ and Roumann Consulting, I will refer to Rousse as a party to the contract because he is the only agent of Roumann involved in this suit and only his acts are at issue.

as is found in deliberate proven violations or disregard of standards of behavior which [the] Company has a right to expect of [its] contractors, vendors or employees, or in carelessness or negligence of such a gross degree or recurrence as to manifest culpability, wrongful intent, or evil design of equal severity to such disregard." *Id.* § 4.2(d).

On August 21, 2017, TVJ sent a letter to Rousse notifying him that TVJ was terminating the agreement, effective September 20, 2017. *See* Countercl. Ex. B, ECF no. 17-2. The letter did not state that TVJ was terminating the agreement for willful misconduct. Moreover, the letter stated that TVJ intended to make commission payments to Rousse for projects accepted during the two-year period following the agreement's termination. The letter stated that this two-year period would end on September 20, 2019.

In the letter, TVJ told Rousse that, given his right to receive commissions on projects accepted by TVJ during the two-year period following his termination, the parties had a "mutual interest" in having TVJ continue to book profitable business with Rousse's clients. *Id.* TVJ stated that, therefore, it expected Rousse not to disparage TVJ (or its affiliate, Symbiont) or interfere with its contracts with Rousse's clients. TVJ warned Rousse that if he disparaged TVJ or interfered with its customer contracts, TVJ would cease making commission payments and consider taking legal action.

The termination provisions of the independent contractor agreement stated that, upon termination, Rousse was required to "immediately deliver to the Company any and all property, documents, records, and materials previously belonging to the Company or sourced from within the Company, including, without limitation, all Confidential

3

Company Information." Agreement § 4.2(e). In its August 21 letter to Rousse, TVJ requested that he "return any property, files (including project files), or Confidential Information belonging to TVJ as soon as possible." ECF No. 17-2 at 2.

On August 22, 2017, Rousse responded to TVJ's letter through his solicitor. *See* ECF No. 73-3. In his response, Rousse acknowledged his termination and stated that he expected TVJ to pay commissions on projects accepted during the two-year period following the termination. Rousse then raised other matters relating to the termination that are not relevant to the present motions.

On August 31, 2017, TVJ responded to Rousse's letter. *See* Countercl. Ex. C., ECF No. 17-3. In this letter, which was addressed to Rousse's solicitor, TVJ reiterated its intent to pay commissions on projects accepted during the two-year period, stating "TVJ will provide Roumann with a commission report and pay the commission by the 30th of each month." *Id.* at 1. The letter ended with the following paragraph:

> Please be advised that TVJ and its affiliated entities wish to minimize contact with Roumann as Mr. Rousse has a history of communicating belligerently with Symbiont, TVJ, its subcontractors, and even its clients. His behavior and communications have risen to the level of "willful misconduct," which is evidenced in numerous emails from Mr. Rousse to each of the noted parties. As such, it is our preference to correspond directly with you, as his Solicitor, when possible. In the meantime, . . . TVJ intends to adhere to the terms of the Agreement.

*Id.* at 2. Although this letter mentioned TVJ's belief that Rousse had engaged in willful misconduct, it did not state that TVJ was terminating the agreement for willful misconduct. To the contrary, the letter reiterated TVJ's intent to continue paying commissions, which TVJ would have had no obligation to do in the event of a termination for willful misconduct.

4

On September 22, 2017, TVJ paid Rousse $56,038.44 for services rendered prior to the agreement's termination. According to Rousse, a short time later, TVJ offered to make a lump-sum payment to Rousse in lieu of the periodic commissions required by the agreement. Rousse declined the offer. In Rousse's view, TVJ then failed to make a required commission payment at the end of September or early October. On October 13, 2017, he and Roumann filed this lawsuit and alleged that TVJ breached the agreement by failing to pay amounts due.

Rousse filed an amended complaint on January 17, 2018, which TVJ answered on February 6, 2018. The next day, TVJ filed a counterclaim against Roumann seeking a declaration that TVJ has no obligation to make further payments under the independent contractor agreement. The counterclaim alleges two grounds for such a declaration. First, TVJ alleges that Rousse engaged in willful misconduct prior to his termination and that therefore TVJ had grounds to terminate the agreement under § 4.2(c). TVJ cites two instances in which Rousse allegedly acted unprofessionally and contends that each meets the agreement's definition of willful misconduct. The first involved a series of insulting statements that Rousse made about Menards and one of its representatives at a construction site. After Rousse made the statements, the Menards representative told TVJ that if he received further communications from Rousse, he would consider TVJ to have breached the construction contract. Menards also issued a "trespass notice" to Rousse that prohibited him from entering any Menards property. These events occurred in June and July of 2016, s*ee* ECF Nos. 62-1 & 62-2, more than a year before TVJ terminated the independent contractor agreement. Rousse states that, at the time these events occurred and TVJ first learned about them,

5
Case 2:17-cv-01407-LA    Filed 08/01/19    Page 5 of 20    Document 86

no one at TVJ reprimanded him or told him that he had engaged in unprofessional conduct. Rousse Aff. ¶ 30, ECF No. 57.

The second instance of alleged unprofessional behavior occurred in January 2017, when Rousse asked TVJ to sign a letter to the Department of Homeland Security that was intended to expedite his travel to the United States from Canada. The letter had been prepared by Rousse's immigration attorney, and it stated incorrectly that Rousse/Roumann did not have a written contract with TVJ. Rousse forwarded the letter to someone at TVJ and asked that it be signed. Eventually, the letter made its way to TVJ's (technically Symbiont's) in-house counsel, who objected to the statement that Rousse and TVJ did not have a written contract. TVJ did not sign the letter, and it was never sent to the Department of Homeland Security. However, TVJ now contends that, by asking it to sign the letter, Rousse either knowingly asked TVJ to lie to the federal government or was "grossly careless" in failing to notice that the letter stated incorrectly that he and TVJ did not have a written contract. *See* ECF No. 60 at 22–23.

TVJ's second basis for seeking declaratory relief involves Rousse's failure to return certain documents to TVJ at the time of his termination, as required by § 4.2(e) of the independent contractor agreement. During discovery in this case, TVJ sent requests for the production of documents to Rousse, asking for any materials in his possession relating to TVJ's customers. In response, Rousse produced emails relating to his work on TVJ projects. Some of those emails had attachments consisting of electronic versions of certain documents. TVJ now contends that three sets of these electronic documents are its property that Rousse should have returned at the time of his termination. The first consists of documents that TVJ emailed to one of Rousse's

customers in order to serve as the contractor for a construction project in February 2017. The documents include TVJ's marketing materials, TVJ's proof of insurance, a list of TVJ's references, and Symbiont's consolidated financial report dated December 31, 2015. The second set of documents consists of an email from The Kroger Co. to Rousse attaching an architectural drawing relating to one of its construction projects. The third set of documents consists of spreadsheets containing contact information for potential subcontractors that TVJ provided to Rousse in 2015 and 2017.

TVJ does not allege that Rousse's failure to return these documents at the time of his termination caused it any specific harm. However, it contends that Rousse's failure to return the documents at that time amounted to a material breach of the independent contractor agreement, which under Wisconsin law would excuse TVJ from continuing to perform under the agreement. TVJ contends that because Rousse committed this material breach, it is no longer obligated to make commission payments to Rousse as required by § 4.2(b).

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

**A.    Willful Misconduct**

In its counterclaims, TVJ alleges that Rousse engaged in willful misconduct prior to his termination, and that therefore TVJ had grounds to terminate the independent contractor agreement under § 4.2(b), which would have ended TVJ's obligation to make further commission payments. TVJ seeks a declaratory judgment confirming that it is not required to make further commission payments. The plaintiffs have moved for summary judgment on this claim. TVJ has not moved for summary judgment on this claim; instead, it contends that there are issues of fact as to whether Rousse's conduct rose to the level of willful misconduct.

As discussed in the background section, above, TVJ claims that Rousse engaged in two forms of willful misconduct: (1) making insulting or unprofessional comments to a Menards representative in June and July 2016, and (2) asking TVJ to sign a letter addressed to the Department of Homeland Security in January 2017 that incorrectly stated that Rousse and TVJ did not have a written contract. The parties dispute whether these events involved willful misconduct as defined by the agreement. However, I need not address issue for, as explained below, the only reasonable conclusion that may be drawn for the record is that TVJ did not terminate the agreement "for" willful misconduct and that TVJ has waived its right to do so.

Section 4.2(c) of the agreement states that "[i]f this Agreement is terminated by the Company for 'Willful Misconduct' (as defined in Subsection (d) below) on the part of Contractor, the Company shall not make any payments required under Article VI," which governs commissions and expenses. Under the plain language of this provision, TVJ would be entitled to halt commission payments only if it terminated the agreement "*for* Willful Misconduct" (emphasis added). However, when TVJ provided notice to Rousse

8

of the termination on August 21, 2017, it did not state that it was terminating the agreement for willful misconduct. Instead, TVJ indicated that it was terminating the agreement under § 4.2(b)—*i.e.*, "for any reason other than 'Willful Misconduct'"—by acknowledging that Rousse was entitled to commission payments on projects accepted by TVJ from Menards, Kroger, etc., in the two-year period following the effective date of the termination. ECF No. 17-2 at 1. TVJ even advised Rousse that he should not try to compete with TVJ (even though he was not subject not a non-compete clause) because he would earn a 30% commission on additional business that TVJ booked with Rousse's clients. Thus, on August 21, 2017, TVJ did not terminate the agreement "for Willful Misconduct."

TVJ notes that, on August 31, 2017, it sent a letter to Rousse's solicitor in which it used the words "willful misconduct." *See* ECF No. 17-3. However, the August 31 letter was not an attempt to convert the termination to one for willful misconduct. Although TVJ used the words "willful misconduct" in the letter, it did not notify Rousse that TVJ was terminating the agreement "for" willful misconduct. Instead, TVJ mentioned its belief that Rousse had engaged in willful misconduct in order to explain to Rousse's solicitor why it wanted to communicate with him rather than Rousse personally. ECF No. 17-3 at 2. Moreover, in the same latter, TVJ reiterated its intent to pay Rousse commissions for work accepted during the two-year period. *Id.* at 1 ("TVJ will provide Roumann with a commission report and pay the commission by the 30th of each month."). If TVJ was terminating the agreement for willful misconduct, it would have had no obligation to continue paying these commissions. Thus, by acknowledging its obligation to pay, TVJ reconfirmed that it had not terminated the agreement for willful misconduct. Further, TVJ

made a post-termination payment to Rousse on September 22, 2017, and thus as of that date TVJ had not claimed to have terminated the agreement for willful misconduct.

As far as the record reveals, the earliest date on which TVJ asserted a right to terminate the agreement for willful misconduct was February 7, 2018, the date on which it filed its counterclaim in this action. However, even the counterclaim does not allege that TVJ terminated the agreement for willful misconduct. Instead, the counterclaim alleges that Roumann's conduct "rose to the level" of willful misconduct. Countercl. ¶¶16, 39. But the agreement does not provide that it is terminated automatically when Rousse engages in willful misconduct. Instead, it grants TVJ the option to terminate the agreement for willful misconduct. And, as explained, TVJ never exercised its option to terminate the agreement for willful misconduct.

Moreover, TVJ has waived its right to terminate the agreement for willful misconduct. Waiver is the voluntary or intentional relinquishment of a known right. *Attoe v. State Farm Mut. Auto. Ins. Co.*, 36 Wis. 2d 539, 545 (1967). However, "[t]his definition is misleading from the start . . . [because it] suggests that a waiver requires more purposefulness than the courts have generally required." *Nugent v. Slaght*, 249 Wis. 2d 220, 227 (Ct. App. 2001) (quoting David V. Snyder, *The Law of Contract and the Concept of Change: Public and Private Attempts to Regulate Modification, Waiver, and Estoppel*, 1999 Wis. L. Rev. 607, 625). Indeed, waiver can occur when the waiving party does not intend to waive, *id.* (citing *Attoe*, 36 Wis. 2d at 545), so long as the party acts "intentionally and with knowledge of the material facts," *id.* The knowledge requirement may be satisfied by actual or constructive knowledge. *Id.* at 227–28. "Constructive knowledge is knowledge which one has the opportunity to acquire by the exercise of

10
Case 2:17-cv-01407-LA   Filed 08/01/19   Page 10 of 20   Document 86

ordinary care and diligence." *Id.* (quoting Wis JI-Civil 3057 (1993) and *Attoe*, 36 Wis. 2d at 546). Moreover, "waiver may be shown by conduct." *Attoe*, 36 Wis. 2d at 545. This will occur "where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistently with the exercise of the right or of his intention to rely upon it." *In re Ross' Estate*, 181 Wis. 125, 194 N.W. 151, 154 (1923) (quoting Bishop, Contracts (2d Enl. Ed.) par. 792).

In the present case, at the time TVJ terminated the agreement, it had knowledge of the material facts surrounding Rousse's alleged willful misconduct. With respect to the Menards issue, Rousse made the disparaging comments in emails in June and July of 2016. *See* ECF No. 62-1 and 62-2. Menards immediately forwarded those emails to TVJ along with its complaint about Rousse's behavior, the trespass notice, and its threat to deem TVJ in breach of contract if Rousse continued to work on the project. *See id*. Thus, a reasonable jury would be compelled to find that TVJ was aware of the material facts surrounding this issue by July 2016, more than a year before it terminated the agreement. As for the immigration issue, TVJ obviously had knowledge of the material facts as soon as they occurred in January 2017, inasmuch as Rousse asked TVJ to sign the letter and the false information about Rousse's not having a contract was discussed among TVJ's management and in-house counsel at that time. *See* Dep. of Sonya Simon at 78–82.

Moreover, TVJ's conduct in August and September 2017 was inconsistent with its right to terminate the agreement for willful misconduct. As I have explained, TVJ's initial termination notice on August 21, 2017 did not mention willful misconduct and

instead stated that TVJ intended to pay commissions during the two-year period, which was inconsistent with a termination for willful misconduct. Further, TVJ induced Rousse to refrain from competing by stating that it was in the parties' "mutual interest" for TVJ to continue to book projects with the customers Rousse had previously managed, given his right to future commissions. ECF No. 17-2 at 1. Then, in its August 31 letter, TVJ again expressed its intent to pay commissions during the two-year period. Although in this letter TVJ also expressed its belief that Rousse had committed willful misconduct, it did not in any way suggest that it had or was terminating the agreement for willful misconduct. Indeed, this letter highlights TVJ's waiver, for in the same letter TVJ both confirmed that it had knowledge of Rousse's willful misconduct and made statements inconsistent with a termination for willful misconduct. Finally, on September 22, 2017, TVJ made a payment to Rousse under the agreement, which was yet another act inconsistent with a termination for willful misconduct.

Based on the above evidence, a reasonable jury would be compelled to find that TVJ never terminated the agreement for willful misconduct and that it has waived its right to do so. Accordingly, the plaintiffs' motion for summary judgment on this issue will be granted.

**B.    Material Breach**

TVJ next contends that Rousse materially breached the independent contractor agreement by failing to return property immediately following his termination, as required by § 4.2(e). TVJ contends that this material breach excuses it from performing further under the agreement and that therefore it is not obligated to pay post-termination commissions. Both the plaintiffs and TVJ move for summary judgment on this claim.

12

As discussed in the background section, above, TVJ contends that three sets of electronic documents that Rousse included in his document productions during discovery in this case constitute its property within the meaning of § 4.2(e): the bid qualification materials, the Kroger architectural drawing, and the list of subcontractors with contact information. The parties dispute whether these documents qualify as "property, documents records and materials previously belonging to [TVJ] or sourced from within [TVJ]." Agreement § 4.1(e). However, as explained below, even if they do, and even if Rousse breached the contract by failing to immediately return them upon his termination, the breach would not be material. Accordingly, I do not need to reach these other questions.

Under Wisconsin law, a material breach by one party may excuse subsequent performance by the other. *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183 (1996). "However, a party is not automatically excused from future performance of contract obligations every time the other party breaches." *Id.* "If the breach is relatively minor and not 'of the essence', the plaintiff is himself still bound by the contract; he cannot abandon performance and get damages for a 'total' breach by the defendant." *Id.* (quoting Arthur L. Corbin, Corbin on Contracts § 700, at 310 (1960)). In other words, "there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract." *Id.* (quoting *Appleton State Bank v. Lee*, 33 Wis.2d 690, 692 (1967)).

In the present case, a reasonable jury could not find that Rousse's failing to return the electronic documents was so serious a breach as to destroy the essential object of the independent contractor agreement. The essential object of that agreement,

so far as TVJ was concerned, was to obtain Rousse's services as a construction project manager and to profit from his relationships with certain clients, such as Menards and Kroger. *See* Agreement p. 1 (whereas clauses). TVJ undoubtedly realized that benefit, as Rousse rendered his services to TVJ for years and generated substantial business for TVJ through his relationships with clients such as Menards and Kroger.

TVJ seems to suggest that Rousse's failure to return property destroyed the essential object of the termination provisions of the agreement. Here, TVJ notes that returning property was Rousse's sole post-termination obligation, and that therefore his lack of compliance with that obligation was a material breach. *See* ECF No. 60 at 12. However, the essential object of the termination provisions was not to ensure that TVJ recovered its property. It was to grant the parties' an option to terminate their ongoing relationship. True, the return of property was one of the obligations that would apply in the event of the termination, but that obligation was not the essential object of the termination provisions. It was a peripheral matter that was part of the winding up of the parties' relationship. *See Appleton State Bank v. Lee*, 33 Wis.2d 690, 692 (1967) (noting that "a breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of the contract," is not material).

Moreover, TVJ has not suffered any specific harm from Rousse's failure to immediately return its property. *See* 23 Williston on Contracts, § 63:3 (4th ed.) ("where a breach causes no damages or prejudice to the other party, it may be deemed not to be 'material.'"). In its brief, TVJ suggests that Rousse may have used the documents to compete with TVJ on projects for Kroger. *See* ECF No. 60 at 14. However, TVJ cites no evidence in the record from which a jury could reasonably conclude that Rousse used

14

the documents to compete. Although TVJ cites evidence showing that Rousse in fact competed with TVJ for Kroger projects and was awarded two projects, *see* TVJ PFOF ¶¶ 111–12, it does not cite evidence showing that Rousse used TVJ's documents in the course of doing so. And TVJ does not explain how the documents would have helped Rousse compete for these projects. TVJ does not, for example, point to secret information in the documents that would have helped Rousse out-bid TVJ for the projects. The only document that seems even remotely sensitive is Symbiont's financial statement, but it covered the years 2014 and 2015, and I cannot think of a way it could have given Rousse an advantage in bidding on construction projects in the year 2017 and later. Thus, a reasonable jury could not find that Rousse used the documents to compete.

One of TVJ's witnesses points to an additional document that Rousse allegedly did not return—which he refers to as an "arch flash study"—and states that TVJ had to incur costs to reacquire the study because Rousse failed to return it. *See* Decl. of Timothy Nelson ¶ 18, ECF No. 62. TVJ does not discuss this document in its briefs, but I will address it because it appears to be the only instance in which TVJ claims to have suffered harm from Rousse's alleged breach. Here, I note that an award of damages would compensate TVJ for the costs it incurred in obtaining a replacement flash study, and that therefore Rousse's failure to return his copy could not be reasonably viewed as a material breach. *See Management Computer Servs.*, 206 Wis. 2d at 186 (a breach is not likely to be material where the other party "can be adequately compensated for its loss through money damages").

Finally, I discuss the factors listed in the Restatement (Second) of Contracts § 241, which Wisconsin uses when assessing whether a breach is material. *See id.* at 184; *Designer Direct, Inc. v. DeForest Redevelopment Auth.*, 313 F.3d 1036, 1042 (7th Cir. 2002). Under the Restatement, the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981). As discussed below, none of these factors suggest that Rousse's failure to return property qualifies as a material breach.

The first factor is the extent to which the injured party will be deprived of the benefit which he reasonably expected. As discussed above, Rousse's alleged breach did not deprive TVJ of the benefit of its bargain to any significant extent. The second factor—the extent to which the injured party can be adequately compensated for the part of that benefit of which he was deprived—also favors Rousse because, as discussed, TVJ suffered either no damages or can be adequately compensated for the cost of replacing the flash study. The third factor also favors Rousse because he would suffer a substantial forfeiture—more than two years' worth of commission payments—if TVJ were excused from further performance.

16

The fourth factor is the likelihood that the breaching party will cure its breach. Here, Rousse returned TVJ's alleged property and offered to delete any copies on his computer. *See* ECF No. 70 at 38–39. Because, as discussed, TVJ has suffered no significant harm from Rousse's failure to return the property at the time of his termination, Rousse's returning the property now and offering to delete his copies would substantially cure any breach.

The remaining factor is the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing. Here, no evidence suggests that Rousse retained documents in bad faith or engaged in sharp dealing. Rather, Rousse states that he retained the emails containing the documents because they were part of his project files, which he keeps as a matter of practice because, in the construction industry, disputes to which the files are relevant often arise after projects are completed. *See* Pls.' PFOF ¶ 164. While this reason may not excuse Rousse's failure to return the information if in fact he was contractually obligated to do so, it does show that he was not acting for an improper purpose. Thus, all the Restatement factors favor Rousse and show that his alleged breach of the agreement was not material.

Accordingly, the plaintiffs' motion for summary judgment on TVJ's claim of material breach will be granted, and TVJ's cross motion will be denied.

**C.    Motion to Seal**

Before concluding, I must address an administrative matter. TVJ has filed under seal the electronic documents that are at the center of its claim for material breach, *see*

ECF No. 61-3, and it filed a motion in support of its request to keep the documents sealed. I address that motion here.

The Seventh Circuit has emphasized that "the public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir.1999). This interest can be overridden only if a party's privacy interest predominates over the public's interest, "that is, only if there is good cause for sealing a part or the whole of the record in that case." *Id.* "In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault)," meet the good-cause standard. *Baxter Int'l Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002).

In its motion, TVJ states that it was the plaintiffs who designated the documents as confidential when they produced them pursuant to the court's protective order. However, the plaintiffs have not responded to TVJ's motion to seal or otherwise attempted to show good cause for sealing those documents. Thus, I assume the plaintiffs do not object to the unsealing of the documents.

TVJ, however, also states that it "supports" the continued sealing of most of the documents, namely, those documents at issue in its claim for material breach (the bid qualification materials, the Kroger architectural drawing, and the list of subcontractors with contact information). But TVJ has not independently attempted to show good cause for keeping these documents sealed. Instead, it asserts in conclusory fashion that the documents "contain confidential business information used for competitive advantage

and financial information for T.V. John and its parent company, which are closely-held corporations." ECF No. 58 at 4. TVJ has not argued that these documents contain trade secrets or fall into the other categories of confidential information listed in *Baxter International*. Nor has TVJ explained how a competitor could use the information in the documents to gain an advantage over it.

Moreover, as I discussed in connection with TVJ's argument that Rousse's failure to return these documents amounted to a material breach, the only document that is even potentially sensitive is Symbiont's financial statement covering the years 2014 and 2015. But even this document is not a trade secret, in that the financial information it contains would not have economic value to a competitor. Of course, TVJ and Symbiont might prefer to keep their financial information secret, but that is not a ground for removing information from the public record. As the Seventh Circuit has explained:

> Many a litigant would prefer that the subject of the case—how much it agreed to pay for the construction of a pipeline, how many tons of coal its plant uses per day, and so on—be kept from the curious (including its business rivals and customers), but the tradition that litigation is open to the public is of very long standing. People who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.

*Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 567–68 (7th Cir. 2000) (citations omitted).

Because no party has shown good cause for keeping the documents at ECF No. 61-3 sealed, I will deny TVJ's motion to seal and direct the Clerk of Court to make the documents available to the public.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for summary judgment on TVJ's counterclaims (ECF No. 52) is **GRANTED**.

**IT IS FURTHER ORDERED** that TVJ's motion for summary judgment on its counterclaims (ECF No. 59) is **DENIED**.

**FINALLY, IT IS ORDERED** that TVJ's motion to seal (ECF No. 58) is **DENIED**. The Clerk of Court shall make ECF No. 61-3 available for public viewing.

Dated at Milwaukee, Wisconsin, this 1st day of August, 2019.

          s/Lynn Adelman
          LYNN ADELMAN
          District Judge