# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ROUMANN CONSULTING INC., and
RONALD ROUSSE,

        Plaintiffs,

      v.                                 Case No. 17-CV-1407

T.V. JOHN & SON, INC., and
THE KROGER CO.,

        Defendants.

---

## PLAINTIFFS ROUMANN CONSULTING AND RONALD ROUSSE'S RESPONSE IN OPPOSITION TO T.V. JOHN'S MOTION FOR SUMMARY JUDGMENT

---

Roumann Consulting, Mr. Rousse, and T.V. John all agree that the purpose of the Independent Contractor Agreement (and the earlier Employment Agreement) was to maximize profits. [1] At termination, T.V. John instructed Roumann Consulting to "cease work immediately" to allow T.V. John to "continue to book profitable projects" with Roumann Consulting's clients. In return, T.V. John promised future commission payments to Roumann Consulting.

We now know that T.V. John did not continue to book profitable projects. T.V. John also did not competently manage the projects that it did book, reducing profitability and further damaging the relationship with Roumann Consulting's clients. Rather than asking for assistance from Roumann Consulting and Mr.

---

[1] *See* T.V. John's Statement of Proposed Material Facts, DN 81, ¶ 49 ("[T]he parties structured their relationship to promote their mutual success—the more profit T.V. John earned on the applicable projects, the more profit Rousse and Roumann would earn.").

Rousse—who had singlehandedly earned T.V. John nearly $10 million of profit during the limited course of the relationship according to T.V. John's own numbers (*see* DN 80, p.8)—T.V. John instead chose to squander opportunity after opportunity, to its own detriment, and more importantly, to Roumann Consulting's detriment. T.V. John's conduct constitutes a breach of contract and breach of the covenant of good faith and fair dealing. T.V. John's motion for summary judgment must be denied.

## Procedural History

The Court has already heard cross-motions for summary judgment in this matter and issued a decision on those motions on August 1, 2019, just three days after T.V. John filed the instant motion on July 29, 2019. T.V. John declined the opportunity to amend its memorandum based upon the Court's decision.

While the cross-motions for summary judgment addressed T.V. John's counterclaims (which the Court ultimately dismissed), the Court did make several findings that are relevant to the current motion. With respect to termination, the Court held:

- "TVJ even advised Rousse that he should not try to compete with TVJ (even though he was not subject to a non-compete clause) because he would earn a 30% commission on additional business that TVJ booked with Rousse's clients." (DN 86, p.9.)

- "TVJ induced Rousse to refrain from competing by stating that it was in the parties' 'mutual interest' for TVJ to continue to book projects with the customers Rousse had previously managed, given his right to future commissions." (DN 86, p.12.)

With regard to the Independent Contractor Agreement, the Court held:

- "The essential object of that agreement, so far as TVJ was concerned, was to obtain Rousse's services as a construction project manager and to profit from his relationships with certain clients, such as Menards and Kroger. *See* Agreement p. 1 (whereas clauses). TVJ undoubtedly realized that benefit, as Rousse rendered his services to TVJ for years and generated substantial business for TVJ through his relationships with clients such as Menards and Kroger." (DN 86, pp.13–14.)

Once again, T.V. John declined the opportunity to amend its submission based upon the Court's later-issued decision.

After the Court's dismissal of all of T.V. John's counterclaims, only three claims remain in this case: (1) Mr. Rousse's breach of contract claim arising from the Employment Agreement; (2) Roumann Consulting's breach of contract claim arising from the Independent Contractor Agreement, as modified; and (3) Mr. Rousse and Roumann Consulting's breach of the duty of good faith and fair dealing claim arising from both contracts. (*See* DN 12.)

Before the summary judgment motions, T.V. John deposited $550,000 in funds with the Court. (DN 35.) In that motion, T.V. John stated that its counterclaims were the only basis to withhold its commission payment of $365,738.03 to Roumann Consulting.[2] (DN 35, ¶¶ 4, 5, 9.) With its counterclaims now dismissed, the company still refuses to turn over the undisputed amount due to Roumann Consulting, even though T.V. John's own expert testified that, to a reasonable degree of certainty, $401,875 is now due.

## Factual Background

Mr. Rousse's six-year relationship with T.V. John generated $100 million of revenue and millions of dollars in profits for T.V. John. The revenues and profits

---

[2] T.V. John expert Michael Kuhn testified that actually $401,875 is due.

Mr. Rousse generated were not just happenstance—they were the result of Mr. Rousse's competence, experience, and hard work. At termination, T.V. John directed Mr. Rousse to stand down to allow T.V. John to perform new and existing work for Roumann Consulting's clients without any interference from Roumann Consulting, and in return, T.V. John promised to pay Roumann Consulting.

After termination, T.V. John did not profitably perform work on existing projects and failed to obtain new projects. T.V. John's refusal to allow Mr. Rousse to participate in bidding on and managing projects for Roumann Consulting's clients caused financial damages to Roumann Consulting that are the subject of this lawsuit.

I. **Mr. Rousse Was an Integral Part of the Profitability of T.V. John Projects for Roumann Consulting's Clients.**

The Independent Contractor Agreement identified Roumann Consulting's job responsibilities at T.V. John, including:

- "[Roumann Consulting] has experience in estimating, acquiring and managing large construction projects from its growing base of client companies. . . ."
- "[T.V. John] hereby retains [Roumann Consulting] as an independent contractor to perform certain sales, estimating and project management services. . . ."

(Statement of Additional Facts ("SAF") ¶ 1.) Roumann Consulting's clients that were subject to the Independent Contractor Agreement were: (1) Menards; (2) Kroger; (3) L.A. Fitness; (4) Farmers Fresh Market; and (5) The Fresh Market. (SAF ¶ 2.)

4

Roumann Consulting's principal, Mr. Rousse, testified that he was hired by T.V. John to "solicit work, obtain work, contract work, client relationships, et cetera." (SAF ¶ 3.) Mr. Rousse understood his role to include "proper project oversight, reaching out for project opportunities, [...] putting competitive bids on these future opportunities, growing that sales base, [and] communicating with superintendents, project managers." (SAF ¶ 4.) Stated another way, Mr. Rousse "estimated the work, contracted the work, procured the work, over[saw] the work, maintained client relationships, [and] maintained communications with all T.V. John staff. . . ." (SAF ¶ 5.)

During Symbiont's acquisition of T.V. John, T.V. John president Tim Nelson described Mr. Rousse as the "main contact" for clients Kroger and Menards, which constituted the majority of T.V. John's business. (SAF ¶ 6.) CFO David Schlidt agreed. He testified that in 2014 before Symbiont acquired T.V. John, Menards and Kroger were T.V. John's largest customers. (SAF ¶ 7.)

T.V. John senior project manager Dean Handrow testified that Mr. Rousse prepared bids and estimates for Kroger and Menards work; Mr. Handrow did not know of anyone else's involvement in the bidding and estimating work. (SAF ¶ 8.) According to project superintendent Randy Neptune, Mr. Rousse competently pursued getting change orders paid for T.V. John. (SAF ¶ 9.)

The parties agree that Mr. Rousse was successful in his work for T.V. John. In its submission, T.V. John stated that its profits were approximately $9.7 million while Mr. Rousse and Roumann Consulting were with the company. (DN 81, ¶¶ 42–

43.) Mr. Nelson "consistently" told others that Mr. Rousse "saved" T.V. John. (SAF ¶ 10.) In two and a half years, Mr. Rousse took T.V. John from an $8 million company to $30 million company. (SAF ¶ 11.)

## II. At and After Termination, T.V. John Prohibited Mr. Rousse's Involvement in Projects for Roumann Consulting's Clients.

On August 21, 2017, T.V. John terminated Roumann Consulting. (SAF ¶ 12.) The termination letter stated:

- "You are hereby directed to cease work immediately."

- "It is in our mutual interest for TVJ to continue to book profitable projects with the clients identified above. Therefore, we expect that you will not disparage TVJ or Symbiont nor interfere with any of their respective contracts. We also expect that, during the period in which Roumann continues to receive commissions, you will not solicit any employees of TVJ or Symbiont for employment with Roumann or any other business entity with which you may be associated. If you or anyone acting on behalf of Roumann disparages TVJ or Symbiont, interferes with TVJ or Symbiont contracts, or solicits their employees, commission payments will cease immediately." (SAF ¶ 13 (emphasis added).)

The direction to "cease work immediately" contradicted the Independent Contractor Agreement, which provided thirty days' notice before termination would be effective. (SAF ¶ 14.)

The next day, August 22, 2017, Roumann Consulting's solicitor reminded T.V. John of the Independent Contractor Agreement's cooperation clause, which states, "The parties hereto shall cooperate with each other to complete any ongoing projects, upon terms mutually agreeable to the parties." (SAF ¶ 15.) The same letter also raised concerns about profits on projects going forward:

> Roumann's concerned that future profits associated with current and future projects will be significantly eroded

> without the ongoing involvement and expertise of
> Roumann in these projects.

(SAF ¶ 16.)

T.V. John proposed to allay both concerns. With respect to the cooperation clause, T.V. John responded: "TVJ will contact Mr. Rousse/Roumann, as needed, at the sole discretion of TVJ." (SAF ¶ 17.) As for the concerns on future profits, T.V. John stated, "TVJ is confident that it will be capable of profitably completing current and future projects without involvement from Roumann." (SAF ¶ 18.)

The termination letter's demands that Roumann Consulting stop work immediately (rather than in 30 days), avoid interfering with contracts, avoid soliciting employees, and not compete with T.V. John were not contained in the Independent Contractor Agreement. (SAF ¶ 19.) Roumann Consulting accepted these new contract terms both in writing through his counsel and through his conduct. (SAF ¶ 20.) Edward Manning, Symbiont's CEO who signed the termination letter, testified that these additional terms were not included in the contract, but were demanded by T.V. John in exchange for two years of commission payments to Roumann Consulting. (SAF ¶ 21.)

On the date of termination, T.V. John also informed Roumann Consulting's clients that T.V. John had parted ways with Roumann Consulting and directed the clients to contact T.V. John personnel, instead of Mr. Rousse. (SAF ¶ 22.) Notably, these were Roumann Consulting's clients—as defined by the Independent Contractor Agreement—not T.V. John's clients. (SAF ¶ 23.)

Even though he insisted that he should be involved, nobody at T.V. John ever contacted Mr. Rousse to obtain help in bidding and estimating new work or performing on the projects that were awarded by Roumann Consulting's clients to T.V. John. (SAF ¶ 24.)

### III.    T.V. John's Bidding and Project Management Fell Short.

T.V. John's termination of Roumann Consulting left big shoes to fill. As for the bidding work that Mr. Rousse had been performing, T.V. John project manager Chad Johnson testified that he became involved in bidding for T.V. John "at some point." (SAF ¶ 25.) Dean Handrow testified that, after termination, bidding work was shared among seven people (Jim Meyer, John Nelson, John Winkler, Dean Handrow, Chad Johnson, Luke Nelson, and Jacqueline Hanson). (SAF ¶ 26.)

Although seven people were apparently involved in bidding work for T.V. John, T.V. John's interrogatory responses indicate that few projects were actually bid, and even fewer were awarded. T.V. John's responses state that nine Kroger projects were bid, with two awards; that 23 Menards projects were bid, with four awards; and that zero The Fresh Market stores were bid. (SAF ¶ 27.) Tim Nelson testified that T.V. John was awarded Menards projects in Racine and Burlington, Wisconsin and Cheyenne Wyoming; a Kroger project in Muncie, Indiana; and no projects for The Fresh Market. (SAF ¶ 28.)

T.V. John's rate of successful bids (i.e., awards) was much lower after it terminated Roumann Consulting than when Mr. Rousse was bidding for T.V. John. Mr. Rousse testified that approximately 60 percent of his bids were successful,

8

whereas only five percent of T.V. John's bids were successful after termination. (SAF ¶ 29.) Mr. Rousse blamed T.V. John's inability to successfully bid projects on its lack of follow-through. (SAF ¶ 30.) He noted that Mr. Nelson was not qualified to successfully bid projects and was instead relying on his staff to do the bidding for him. (SAF ¶ 31.) As for T.V. John's Chad Johnson, Randy Neptune testified that Mr. Johnson could have been a competent project bidder if he had not been overworked. (SAF ¶ 32.)

Similar to its bidding, T.V. John's project management also fell short after it terminated Roumann Consulting. The Court may recall that Roumann Consulting successfully bid two Kroger projects before T.V. John terminated it (Jeffersonville and West Lafayette, Indiana), but most of the work was performed after termination, without Roumann Consulting's input. (SAF ¶ 33.)

Mr. Rousse testified that these two Kroger projects and a Kroger Fuel Center in Flushing, Michigan underperformed without his involvement. (SAF ¶ 34.) Mr. Rousse testified that he anticipated a $500,000 profit for Jeffersonville, a $1.1–1.2 million profit for West Lafayette, and a $150,000 profit for the Flushing Fuel Center. (SAF ¶ 35.) T.V. John's own calculations (which are disputed) reveal that Mr. Rousse is right: T.V. John calculated Jeffersonville's profit at $169,014, West Lafayette's profit at $693,924, and Flushing Fuel Center's profit at $60,897. (SAF ¶ 36.)

Randy Neptune was T.V. John's on-site superintendent for the Jeffersonville project. (SAF ¶ 37.) He has 25 years of experience in the construction industry.

9

(SAF ¶ 38.) Mr. Neptune described the Jeffersonville project as problematic from the start; recognizing problems, Mr. Neptune repeatedly asked Tim Nelson for assistance. (SAF ¶ 39.) Mr. Neptune did not get Mr. Nelson's help for months. (SAF ¶ 40.) Mr. Neptune testified about the Jeffersonville project and how Mr. Rousse would have handled it:

> Q. Who took over Mr. Rousse's role at T.V. John when Roumann Consulting was terminated?
> A. No one.
> Q. What was the result of no one taking over the role?
> A. I got fired and the job went to hell.
> Q. Well, what gaps were left when Roumann Consulting was terminated?
> A. Again, per my earlier statement, no actions were taken. The actions that weren't taken were the actions that Ron [Rousse] would have taken or had been taking during the course of my employment with T.V. John.
> Q. Okay. So would it be accurate to say that Roumann Consulting was playing an important role in these T.V. John projects?
> A. Yes.
> Q. And that once T.V. John terminated Roumann Consulting, there was nobody to oversee these projects properly?
> A. No, I wouldn't say that.
> Q. How would you characterize it?
> A. I would say that Ron [Rousse] – when there was an issue that couldn't be handled, he would step in and be the second- or third-tier person that would make things happen to get the project done.
>     And when he left, no one took that position. Nothing was done. The project was left to die on the vine and I was left to take the blame for it.

(SAF ¶ 41 (objections omitted; emphasis added).)

T.V. John was the premier general contractor for Kroger in the Midwest before T.V. John terminated Roumann Consulting. (SAF ¶ 42.) Before the Kroger

Jeffersonville project (and before T.V. John terminated Roumann Consulting), Mr. Neptune understood Kroger to have been happy with the work that T.V. John was performing. (SAF ¶ 43.) The Kroger Jeffersonville project was T.V. John's first in Kroger's Atlanta division. (SAF ¶ 44.) The Atlanta division is Kroger's second largest, extending from Florida to southern Indiana. (SAF ¶ 45.) Mr. Rousse testified that Kroger's Atlanta division was a significant opportunity for him that T.V. John squandered with its poor performance on its first and only Atlanta division project, Jeffersonville. (SAF ¶ 46.) Mr. Rousse testified that Kroger's Atlanta division personnel will not return his calls or emails because of the Jeffersonville project. (SAF ¶ 47.) Kroger's Gil Ward specifically told Mr. Rousse that Kroger's Atlanta division will not enter into contracts with him until issues with Jeffersonville (denoted L776) are resolved. (SAF ¶ 48.) T.V. John also significantly damaged Mr. Neptune's reputation with Kroger through T.V. John's poor performance on the Jeffersonville project, preventing Mr. Neptune from working with Kroger in the Atlanta and Indianapolis divisions. (SAF ¶ 49.)

Mr. Rousse refrained from seeking work from his own clients until he discovered in this lawsuit that T.V. John was not competently bidding work, was not being awarded projects, and was not profitably performing work for the projects it was awarded. (SAF ¶ 50.)

## IV. The Damages Sought in this Lawsuit.

Given that Mr. Rousse and Roumann Consulting generated millions in profits for T.V. John, it follows that the damages claimed in this lawsuit for breach of

contract and breach of the covenant of good faith and fair dealing are significant.

On May 8, 2019, pursuant to the Court's scheduling order, Mr. Rousse and

Roumann Consulting produced reports from experts Stephen VanderBloemen,

George Minnich, and Tracy Coenen that itemize and substantiate the damages

claimed in this action. (SAF ¶ 51.) The preliminary total, which will be updated

before trial, is $8,830,684.00. (SAF ¶ 52.)

### A. After the Court's August 1, 2019 Decision, the Parties Agree That Commission Payments Are Due.

This Court's August 1, 2019 Decision and Order dismissed T.V. John's

counterclaims and clarified that Roumann Consulting was terminated for

convenience. (SAF ¶ 53.) Therefore, Roumann Consulting is owed commissions on

completed, ongoing, and future T.V. John projects for the identified clients pursuant

to Section 4.2(b) of the Independent Contractor Agreement, which states:

> If this Agreement is terminated by [T.V. John] for any reason other than "Willful Misconduct" . . . on the part of [Roumann Consulting], [T.V. John] shall make any [commission] payments required under Article VI below on projects related to the customers listed in Schedule A . . . whether or not obtained or solicited by [Roumann Consulting] and accepted by [T.V. John] either during the term of this Agreement or within the two (2) year period following the effective date of the termination of the Agreement.

(SAF ¶ 54.)

Prior to this Court's decision, T.V. John admitted via the testimony of its

Rule 30(b)(6) designee that Roumann Consulting was owed $220,989 in

commissions as of October 31, 2018—and would be owed an estimated total of

$441,085 upon the completion of the projects—if commissions were due under Section 4.2(b). (SAF ¶ 55.) T.V. John expert Michael Kuhn calculated the amount due of $401,875. (SAF ¶ 56.)

## B. Roumann Consulting Disputes T.V. John's Commission Calculations.

Roumann Consulting disputes T.V. John's commission calculations. Expert George Minnich opines that T.V. John is improperly depressing Roumann Consulting's commissions by increasing overhead charges, charging for positions not previously charged, and deviating from its pre-termination billing practices. (SAF ¶ 57.) For example, after Roumann Consulting's termination, Mr. Nelson billed fifteen minutes per day to each open project, and T.V. John's administrative staff uniformly charged one hour per day, per open project. (SAF ¶ 58.) According to Mr. Minnich, "[s]preading office overhead this way and charging overhead costs that are unrelated to the project does not increase corporate profitability. This practice only reduces the amounts due to Mr. Rousse." (SAF ¶ 59.)

Mr. Minnich's report compared the cost accounting methods for four of the projects and identified in detail the new charges being applied to suppress the calculation of commissions owed. (SAF ¶ 60.) A comparison of Mr. Minnich's conclusions and T.V. John's alleged Net Profit Realized shows the differences between calculation methods:

| Project | Minnich's Commission Calculation | T.V. John's Commission Calculation |
|---|---|---|
| Flushing Fuel Center | $34,468.00 | $18,269.00 |
| Indianapolis | $223,866.00 | $187,303.00 |
| Jeffersonville | $252,036.00 | $36,759.90 |

| West Lafayette | $336,753.00 | $195,757.64 |
| Total | $847,123.00 | $438,089.54 |

(SAF ¶ 61.) Mr. Minnich also found evidence of increased overhead costs resulting from the change from Roumann Consulting to T.V. John as to the quality and extent of project management, resulting in lost efficiencies and increased costs. (SAF ¶ 62.)

Expert Stephen VanderBloemen, a Certified Public Accountant, prepared a calculation of the Net Profit Realized based upon the computational method used by T.V. John prior to the termination of Roumann Consulting, but using the raw data extracted from T.V. John's accounting system as of April 3, 2019. (SAF ¶ 63.) Mr. VanderBloemen concluded that the amount of commissions owed on projects commenced prior to Roumann Consulting's termination was $867,740, and commissions on projects post-termination were $1,710,965. (SAF ¶ 64.) Mr. VanderBloemen also opined that Roumann Consulting and Mr. Rouse are owed hourly fees of $90,000 (pre-termination) and $173,600 (post-termination). (SAF ¶ 65.)

Mr. VanderBloemen identified incorrect charges in T.V. John's calculation, including: (1) T.V. John failed to account for $118,232 in project fade listed in its records; and (2) Improper charges of $68,000 to various projects. (SAF ¶ 66.)

Expert Tracy Coenen, a forensic accountant, evaluated the impact on the commissions resulting from the dramatic drop off of T.V. John's success rate of obtaining work through competitive bidding. (SAF ¶ 67.) Ms. Coenen opined that T.V. John's lackluster effort to perform Mr. Rousse's former duties resulted in lost

14

commissions of an additional $3,975,288. (SAF ¶ 68.) Together, Messrs. Minnich and VanderBloemen and Ms. Coenen also attribute millions of dollars of damage to poor bidding and project management. (SAF ¶ 69.) Notably, T.V. John chose not to take discovery depositions of Roumann Consulting and Mr. Rousse's three experts. (SAF ¶ 70.)

## C. T.V. John's Expert Concedes Aspects of the Claims and Acknowledges Fact Disputes for Others.

T.V. John disclosed one expert, accountant Michael Kuhn. (SAF ¶ 71.) Mr. Kuhn states that he calculated Net Profit Released based upon T.V. John's performance data after termination, using the raw data from T.V. John's accounting system as of April 30, 2019. (SAF ¶ 72.)

Mr. Kuhn concluded that the commission calculation provided by T.V. John as of October 31, 2018 was inaccurate and updated the information through April 30, 2019, resulting in a lower amount due of $401,875. (SAF ¶ 73.) Mr. Kuhn's report cites to the American Institute of Certified Public Accountants' *Construction Contractors Audit and Accounting Guide*, which states, "The quality and extent of project management often determine whether a construction project is profitable or unprofitable." (SAF ¶ 74.) Mr. Kuhn testified that this factor was part of the standard of care for his profession. (SAF ¶ 75.) Notwithstanding that testimony and the citation in his own report, Mr. Kuhn admitted that he did not consider the quality and extent of post-termination project management. (SAF ¶ 76.) Mr. Kuhn ultimately conceded that this evaluation was "essential" to any evaluation of the status and profitability of each project. (SAF ¶ 77.)

Mr. Kuhn did not evaluate concerns raised by Mr. Minnich over poor project management; that subject was not part of his report. (SAF ¶ 78.) Mr. Kuhn did not analyze whether projects were being bid or negotiated based on carefully compiled data, even though this too is part of the standard of care. (SAF ¶ 79.) Finally, Mr. Kuhn acknowledged fact disputes regarding the $7,000 management fee charged to each The Fresh Market job. (SAF ¶ 80.)

### D. Invoice Nos. 12, 13, and 14 Are Due and Owing.

Roumann Consulting has submitted Invoice Nos. 12, 13, and 14 to T.V. John, but T.V. John has failed to pay them. The relevant portion of Invoice No. 12 is for an airline ticket that Mr. Rousse booked from his home near Windsor to a T.V. John project in Indianapolis. (SAF ¶ 81.) Mr. Rousse was not able to fly on advice of his physician. (SAF ¶ 82.) This was one of many tickets that Mr. Rousse booked and was reimbursed for while working for T.V. John, and no aspect of the ticket violates any T.V. John policy or procedure. (SAF ¶ 83.) Mr. Rousse believes the ticket to be a reasonable and necessary expense. (SAF ¶ 84.)

Invoice No. 13 is for Mr. Rousse's time (billed consistent with the Independent Contractor Agreement) that he worked on the Flushing Fuel Center, all before the date of termination, August 21, 2017. (SAF ¶ 85.) T.V. John was aware of Mr. Rousse's time billed for this project because it was provided communications regarding all of Mr. Rousse's efforts to successfully bid the project. (SAF ¶ 86.)

16

Invoice No. 14 is for Roumann Consulting's 30% share of the $150,000 aggregate reserve, which is $45,000. (SAF ¶ 87.) The aggregate reserve was intended to cover project warranty costs. (SAF ¶ 88.) T.V. John's corporate designee testified that this amount, held in escrow, "will come due after the final project has been completed and closed out." (SAF ¶ 89.) Roumann Consulting's position is that the amount is due now because T.V. John will not allow Mr. Rousse to be involved in project warranty work, which he would be able to negotiate and more competently deal with than T.V. John. (SAF ¶ 90.)

### Legal Standard

In the midst of its second effort to resolve this case on summary judgment, T.V. John omits the applicable legal standard.[3] Of course, T.V. John may have failed to cite the applicable rule because its burden on summary judgment is so high:

As the movant, T.V. John is entitled to summary judgment only if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All evidence must be viewed in a light most favorable to the nonmoving party, and that party must receive the benefit of all reasonable inferences to be drawn from the underlying facts." *See Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft*, 849 F. Supp. 666, 668 (E.D. Wis. 1994). Even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant judgment in its favor. *Hotel 71 Mezz v. Nat'l Ret. Fund,* 778 F.3d 593, 601–02 (7th Cir. 2015).

---

[3] It is difficult to conceive of a scenario where a movant is entitled to relief when it does not mention or apply the legal standard for the relief sought.

## Argument

The damages Roumann Consulting and Mr. Rousse seek to recover in this lawsuit are not theoretical or speculative, as T.V. John alleges. To the contrary, the damages are simply the benefit of the bargain that T.V. John willingly struck with Roumann Consulting and Mr. Rousse. These damages—calculated by the experts based upon Mr. Rousse's six years of success at T.V. John—are what Roumann Consulting and Mr. Rousse are entitled to for T.V. John's breaches under the plain terms of the Independent Contractor Agreement, as modified, and the covenant of good faith and fair dealing.

## I. At Termination, the Parties Modified the Independent Contractor Agreement, and T.V. John Confirmed Its Obligation to Maximize Profits.

The parties modified the Independent Contractor Agreement at termination, to impose new terms upon Roumann Consulting and confirm T.V. John's obligations to maximize profits on new and existing work. Although the Independent Contractor Agreement states that it may be "altered, amended or modified only in writing signed by both parties," T.V. John's written modifications issued with knowledge of the existing contract constitute a waiver of this provision.

As this Court has already summarized, "waiver is the voluntary or intentional relinquishment of a known right" that "can occur when the waiving party does not intend to waive, . . . , so long as the party acts 'intentionally and with knowledge of the material facts." (DN 86, p.10 (citing *Attoe v. State Farm Mut. Auto. Ins. Co.,* 36 Wis. 2d 539, 545 (1967).) Here, T.V. John undoubtedly waived the

18

two-party written modification provision when it sent its August 21, 2017 and August 31, 2017 letters to Roumann Consulting.

T.V. John intentionally and with knowledge of material facts amended the Independent Contractor Agreement by adding additional terms, including that Roumann Consulting cease work immediately, not interfere with projects, not solicit employees, and not compete with T.V. John. In exchange, T.V. John promised to pay commissions and to pursue additional profitable projects with Menards, The Fresh Market, and Kroger. T.V. John issued the additional obligations and new terms with full knowledge that they were not contained in the Independent Contractor Agreement.

Importantly, Symbiont CEO Edward Manning confirmed that these terms were new and that they were being demanded to limit Mr. Rousse's future involvement with T.V. John while also securing T.V. John's ability to maintain its employees and future Menards, Kroger, and The Fresh Market work.

Roumann Consulting accepted these additional terms both in writing through his counsel and by his conduct, which is consistent with traditional contract modification principles: "Modification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification." *Nelsen v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 55, 90 N.W.2d 123, 133 (1958) (quoting 17 C.J.S. Contracts § 375, p. 860. e). Here, the minds of the parties met as to the modifications that T.V. John demanded, and

the parties' agreement is evidenced by Roumann Consulting's withdrawal from ongoing projects and its own clients until discovery in this lawsuit revealed that T.V. John had breached its agreement to competently perform projects and obtain new work

## II. The Independent Contractor Agreement and the Covenant of Good Faith and Fair Dealing Obligated T.V. John to Maximize Profits.

This is not a case where T.V. John's obligations under the contract are unclear. Roumann Consulting's commission payments are calculated based upon Net *Profit* Realized. If the parties did not anticipate profits, such a provision would serve no purpose. *See Ash Park, LLC v. Alexander & Bishop, Ltd.,* 2015 WI 65, ¶ 37, 363 Wis. 2d 699, 866 N.W.2d 679 ("Interpretations that give reasonable meaning to each provision in the contract are preferred over interpretations that render a portion of the contract superfluous."). Moreover, this Court has already held that, from T.V. John's perspective, the purpose of the agreement was to profit. (DN 86, pp.13–14.) And T.V. John acknowledges that profit was the goal. (DN 81, ¶ 49.)

The genesis of the claims here is that T.V. John failed to do what it said it would do to attain profits: bid and obtain work and profitably perform that work. Roumann Consulting alleges that T.V. John's actions (and inaction) constitute breaches of the contract (in its original form and as modified) and breaches of the covenant of good faith and fair dealing.

"Wisconsin law recognizes that every contract imposes an obligation of good faith in its performance." *Tilstra v. Bou-Matic, LLC*, 1 F.Supp.3d 900, 910 (W.D. Wis. 2014). This is closely related to the Independent Contractor Agreement's

cooperation clause, which states, "The parties hereto shall cooperate with each other to complete any ongoing projects, upon terms mutually agreeable to the parties."[4]

Several aspects of the covenant are relevant here. First, as a threshold matter, "whether a party to a contract has breached its implied duty of good faith is a question of fact." *Schuetta v. Aurora Nat'l Life Assur. Co.*, 27 F.Supp.3d 949, 960 (E.D. Wis. 2014). Good faith is a question of motive, and motive must be determined by the trier of fact after hearing all the evidence. *Greer Props., Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 461 (7th Cir.1989). Notably here, T.V. John makes no effort to refute Roumann Consulting's conclusions that T.V. John's bidding and project work were deficient. Rather, T.V. John's position is that the contract did not require it to competently bid or perform projects. Given that good faith is a question of fact, T.V. John's motion should be rejected on that basis alone.

Second, "[a] party can be liable for breach of the implied covenant of good faith even though all the terms of the written agreement may have been fulfilled." *Goldman v. Lawton & Cates, S.C.*, 2015 WI App 28, ¶ 53, 361 Wis. 2d 285, 862 N.W.2d 619 (internal quotations omitted). Although unclear, it appears that T.V. John may be arguing that it did not commit a technical breach of any contract term. Even if that is true—which is disputed—T.V. John undermined the entire purpose

---

[4] Despite the cooperation clause, T.V. John argues that the contract does not "require that the parties continue to work together during the two-year post-termination period." (DN 80, p.7.) This position is absurd: the very definition of "cooperate" is "to act or <u>work</u> with another or others: act <u>together</u>." *Cooperate*, Merriam-Webster Online Dictionary, 2004. http://www.m-w.com (19 Sept. 2019) (emphasis added).

of the contract (to maximize profits) by deficiently performing bidding and project work.

The Supreme Court of Wisconsin offered the following on good faith:

> Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. * * * Moreover, <u>there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely</u> do anything to prevent the other party from carrying out his part of the agreement, or <u>do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract</u>. Ordinarily if one exacts a promise from another to perform an act, the law implies a counter-promise against arbitrary or unreasonable conduct on the part of the promisee.

*Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660, 661 (1969) (emphasis added). Stated another way:

> The duty of good faith means that a party to a contract will not do anything that injures or destroys the right or ability of the other to receive the benefits under the contract. The touchstones of good faith are honesty and reasonableness. The duty of good faith conduct in all contracts is intended as a guarantee against arbitrary or unreasonable conduct by a party.

*Budgetel Inns, Inc. v. Micros Sys., Inc.*, No. 97-CV-301, 2002 WL 32123532, *9 (E.D. Wis. Jan. 30, 2002) (internal citations omitted). "Behaviors recognized as a lack of good faith are: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 41, 301 Wis.2d 752, 734 N.W.2d 169. The covenant covers "acts of constructive bad faith, failure to act, carelessness,

22

neglect and other actions that frustrate the purpose of the agreement." *Springbrook Software, Inc. v. Douglas Cnty*, No. 13-CV-760-slc, 2015 WL 2248449, *18 (W.D. Wis. May 13, 2015).

In our case, T.V. John affirmatively told Roumann Consulting to stand down while it would continue "to book profitable projects." Then, T.V. John failed to bid work, get awarded projects, or profitably perform on those projects. T.V. John apparently had seven different people involved in bidding on projects, yet its rate of awards was a fraction of what Mr. Rousse had been achieving. On the projects that it was awarded, T.V. John's profits plummeted. T.V. John "intentionally and purposely" destroyed Roumann Consulting's rights to receive its "fruits of the contract"—profit. T.V. John was neither honest nor reasonable. It told Roumann Consulting that it was going to bid on projects and profitably perform on those projects, but it did not do that.

The parties' history is also an important consideration in assessing good faith. "As the parties' performance in executing the contract increases, so too grows the scope and bite of the good faith doctrine." *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 36, 291 Wis. 2d 393, 717 N.W.2d 58. Here, the parties had a lengthy, mutually profitable relationship with one another. T.V. John knew that its involvement in Mr. Rousse's successes with T.V. John was minimal and that it did not have the expertise to perform at the level that Mr. Rousse had. T.V. John could have asked for bidding or project management assistance from Roumann Consulting, or could have informed Roumann Consulting that it would not be able

23

to perform. Indeed, the contractual cooperation clause required T.V. John to make this contact and ask for help. Additionally, Roumann Consulting's solicitor reminded T.V. John of this obligation right after termination. Instead, T.V. John evaded the spirit of the bargain—profit—and watched opportunities slip away. T.V. John failed to ask for help when it desperately needed it.

### III.   T.V. John's Characterizations of the Damages Sought in This Lawsuit Are Inaccurate and Contrary to Wisconsin Law.

T.V. John submitted no proposed facts on the damages sought by Mr. Rousse and Roumann Consulting in this lawsuit, as itemized by the three experts (*see* DN 81), yet T.V. John concludes that it is entitled to summary judgment dismissing all of the claims in this lawsuit based solely on the fourth element of a breach of contract claim, damages. (*See generally* DN 80.) Needless to say, without even discussing the claimed damages, T.V. John cannot be entitled to summary judgment or partial summary judgment on any aspect of the remaining claims. Even T.V. John's own expert admitted that at least $401,875 in commission payments are presently due and that he did not consider several material aspects of Roumann Consulting's claims. T.V. John also does not dispute that the $45,000 of aggregate reserve moneys are due.

### A.  There Is No Dispute That Roumann Consulting Is Owed Damages.

In its motion to deposit funds with the Court, T.V. John stated that its counterclaims were its only grounds to withhold commission payments owed to Roumann Consulting. (DN 35, ¶¶ 4, 5, 9.) As of the date of that filing, June 25, 2018, T.V. John calculated unpaid commissions at $365,738.03. (DN 35, ¶ 9.) T.V.

John's expert has increased this amount to $401,875. Roumann Consulting still disputes the actual amount due. (*See generally* DN 69-1.) However, now that T.V. John's counterclaims have been dismissed (DN 85), by T.V. John's own admission, there are no grounds to continue to withhold payment. T.V. John's failure to move to release the funds requires the denial of its motion for summary judgment because commissions are presently due, and withholding the commissions is a breach.

### B. Genuine Disputes of Material Fact Prevent Summary Judgment on Invoice Nos. 12, 13, and 14.

T.V. John argues that no payment is due on Invoice Nos. 12, 13, and 14, while Roumann Consulting's position is that payment is due because these are proper invoices. Viewing the facts in a light most favorable to Roumann Consulting, T.V. John's motion must be denied on this item. *See Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft*, 849 F. Supp. 666, 668 (E.D. Wis. 1994).

For Invoice No. 12, Mr. Rousse declares that he purchased the airline ticket in the same way that he had purchased many others, that it was not an outlier in any way, and that the purchase was not in violation of any T.V. John policy or procedure. The parties dispute whether this charge was "reasonable and necessary," which is the standard provided in Section 6.2 of the Independent Contractor Agreement. This dispute on reasonableness cannot be resolved on summary judgment.

Invoice No. 13 is for hourly wages for work performed on the Flushing Fuel Center project before termination. T.V. John states that Mr. Rousse did not prove that he actually worked these hours, but T.V. John was aware of the work because

it was provided communications regarding all of Mr. Rousse's efforts to successfully bid the project. This dispute also cannot be resolved on summary judgment.

Last, Invoice No. 14 is for Roumann Consulting's $45,000 share of the aggregate reserve. T.V. John refuses to pay the invoice now, even though it has excluded Mr. Rousse from the project warranty process. Mr. Rousse declared that he would be better able to handle warranty claims than T.V. John. Additionally, T.V. John's corporate designee did not even dispute the validity of this invoice. Like the other invoices, this dispute cannot be resolved in T.V. John's favor on summary judgment.

## C. Black Letter Contract Law Entitles Roumann Consulting to the Benefit of Its Bargain.

T.V. John declined the opportunity to take discovery depositions of Roumann Consulting and Mr. Rousse's three experts. In its brief, T.V. John did not cite a single legal authority regarding the measure of damages for a breach of contract. (*See* DN 80.) Yet somehow T.V. John concludes that Roumann Consulting and Mr. Rousse are not entitled to any damages whatsoever.

The damages claimed in this lawsuit are actually nothing more than what is provided under Wisconsin law for a breach of contract:

> The measure of damages for a breach of contract is the amount which will compensate the plaintiff for the loss suffered because of the breach. A party who is injured should, as far as it is possible to do by monetary award, be placed in the position in which he or she would have been had the contract been performed. The fundamental basis for an award of damages for breach of contract is just compensation for losses necessarily flowing from the

> breach. […] The injured party is entitled to the benefit of
> his or her agreement. . . .

Wis. JI-Civil 3735, Damages: Loss of Expectation. Compensatory damages are limited to what was foreseeable at the time of contracting. *Kramer v. Bd. of Educ. of Sch. Dist. of Menomonie Area*, 2001 WI App 244, ¶ 10, 248 Wis. 2d 333, 635 N.W.2d 857. Under Wisconsin law, damages are a finding of fact. *Designer Direct, Inc. v. DeForest Redevelopment Auth.*, 368 F.3d 751, 752 (7th Cir. 2004). In making this finding, the fact-finder must determine (1) that the damages flow directly and necessarily from the breach of contract and (2) that the damages were foreseeable. *See Magestro v. No. Star Envtl. Constr.,* 2002 WI App 182, ¶ 10, 256 Wis. 2d 744, 649 N.W.2d 722.

In addition to compensatory damages, Roumann Consulting and Mr. Rousse are also entitled to consequential damages. *Magestro v. No. Star Envtl. Constr.*, 2002 WI App 182, ¶ 10, 256 Wid. 2d 744, 649 N.W.2d 722. Consequential damages are those that are the natural and probable results flowing from the breach. Wis. JI-Civil 3710, Consequential Damages for Breach of Contract. Awards of future profits are also available "when the circumstances are such that future damages may be computed with some reasonable certainty." Wis. JI-Civil 3725, Damages: Future Profits. "The determination as to whether future profits were within the contemplation of the parties when contracting necessarily turns on the specific facts established at trial." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1362 (7th Cir. 1996).

Consequential damages for breach of employment contracts, like the two contracts at issue here, include permanent injury to professional reputation and loss of career development opportunities. *Kramer v. Bd. of Educ. of Sch. Dist. of Menomonie Area*, 2001 WI App 244, ¶ 12, 248 Wis. 2d 333, 635 N.W.2d 857. *See also Nelsen v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 61, 90 N.W.2d 123 (1958) (awarding loss of profits for breach of contract to insurance agent who worked on commission).

Had T.V. John not breached the Independent Contractor Agreement, including the cooperation clause and the implied covenant of good faith, through the action and inaction discussed throughout this brief (failure to competently bid, get awarded projects, and perform work), Roumann Consulting and Mr. Rousse would have earned the claimed damages. Thus, the claimed damages put Roumann Consulting and Mr. Rousse in the place they would be had T.V. John performed.

As for foreseeability, the parties negotiated for the cooperation clause (which Roumann Consulting's solicitor reminded T.V. John about on August 22, 2017) and termination language that provided for post-termination payments. These provisions, as well as the covenant of good faith, evidence that the parties contemplated the payment of future payments, including future profits, to Roumann Consulting, after termination. Additionally, when the parties modified the Independent Contractor Agreement (*see* Section I, *supra*), Roumann Consulting's solicitor warned T.V. John that the projects might suffer without Mr. Rousse's involvement. T.V. John cannot reasonably dispute that future profits were on the

minds of the parties while the contract was being formed and when it was later being modified.

### D. Mr. Rousse and Roumann Consulting Dispute Certain of T.V. John's Charges to Projects.

T.V. John concludes its memorandum with a number of arguments related to the concept that it can unilaterally decide what is and is not a valid charge to a project. (*See* DN 80, pp.27–31.) These arguments can be summarily rejected. First, much like the disputed invoices, because the parties dispute the material facts here, summary judgment should be denied. (*See* Resp. to T.V. John's Stmt. of Facts, ¶¶ 102–108.) Second, no contract provision provided T.V. John the unilateral right to set or adjust any project cost for its own benefit. T.V. John could have written such a provision into the contracts, but did not. The fact that T.V. John charged an amount to a project does not conclusively prove that the amount charged was legitimate, and one purpose of this lawsuit is to ferret out those improper charges.

T.V. John's arguments that Mr. Rousse waived and is estopped from objecting to costs charged to projects similarly have no merit. Mr. Rousse and Roumann Consulting accepted payment of undisputed amounts while continuing to dispute other amounts. T.V. John does not allege that Mr. Rousse signed a waiver or release or that the statute of limitations has run. There is simply nothing offered to support T.V. John's arguments, and they should be rejected.

## <u>CONCLUSION</u>

For these reasons, the Court should deny T.V. John's motion for summary judgment.

Dated September 20, 2019.

HALLOIN LAW GROUP, S.C.
Attorneys for Plaintiffs Roumann
Consulting, Inc. and Ronald Rousse

s/ Scott R. Halloin
Scott R. Halloin
State Bar No. 1024669
James J. Irvine
State Bar No. 1088726

HALLOIN LAW GROUP, S.C.
839 North Jefferson Street
Suite 503
Milwaukee, Wisconsin 53202
p 414-732-2424
f  414-732-2422
shalloin@halloinlawgroup.com
jirvine@halloinlawgroup.com