UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

ROUMANN CONSULTING INC., and
RONALD ROUSSE,

Case No. 17-CV-1407

        Plaintiffs,

v.

T.V. JOHN & SON, INC., and
THE KROGER CO.,

        Defendants.

**DEFENDANT T.V. JOHN & SON, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

As should be clear by now, this is an action for alleged breach of contract – a written, fully-integrated contract that addressed precisely the eventuality that gave rise to this dispute. Despite that fact, Plaintiffs persist in seeking damages premised on supposed duties found nowhere in that agreement, on subjects about which the parties expressly allocated risk and reward. Thus, Roumann argues it is entitled to compensation for work it never performed and a slice of "profits" on projects that T.V. John never obtained.

As a matter of law, the contract does not permit recovery of these sorts of damages. It is undisputed that the governing contract gave T.V. John the unconditional right to terminate its relationship with Roumann. It is likewise undisputed that the contract set forth a precise formula for determining the amount Roumann was entitled to receive post-termination: 30% of Net Profit Realized for construction projects for which T.V. John contracted during the two year period following the September 20, 2017 termination of the Agreement – no more and no less. It is undisputed that the calculation of Net Profit Realized cannot yet be determined, because the

definition of Net Profit Realized requires, among other things, that T.V. John *actually receive* payment from the end client before amounts are due to Roumann, and certain projects are not yet complete. And it is undisputed that this Court has already ruled the only damages Plaintiffs may seek are those sounding in contract; this is not a tort case.

Under these circumstances, the only compensation to which Plaintiffs could be entitled consists of Net Profit Realized as defined in the Independent Contractor Agreement. T.V. John now asks this Court to so rule, and to hold open determination of that amount pending completion of the remaining projects subject to that Agreement.

## ARGUMENT

**I.     The Rights of the Parties Must be Determined under the Terms of the Independent Contractor Agreement, and Not a Supposed "Modification" of it.**

Forced to confront the incompatibility of the damages it seeks with the written contract it signed, Roumann now argues that the contract was "modified." In particular, the Response Brief claims that the parties agreed that "Roumann [would] cease work immediately, not interfere with projects, not solicit employees, and not compete with T.V. John," in exchange for which T.V. John would pay commissions and "pursue additional profitable projects with Menards, The Fresh Market, and Kroger." (Resp. Br. 19.)

This new contention suffers from at least five independent, insurmountable problems.

**A.     The Plaintiffs have never pleaded modification.**

Modification of a contract must be pleaded by the party who claims the modification was made. *Goebel v. Nat'l Exchangors, Inc.*, 88 Wis. 2d 596, 614, 277 N.W.2d 755, 764 (1979), (citing *S & M Rotogravure Service, Inc. v. Baer*, 77 Wis. 2d 454, 471, 252 N.W.2d 913 (1977)). It is undisputed that the Plaintiffs did not plead modification, either in their original complaint,

2

their first amended complaint, or even in their requested second amended complaint. (*See* Dkt. Nos. 1 (Compl.), 12 (First Am. Compl.), 23-1 (Second Am. Compl.).)

This case has proceeded for two years on the premise that the rights of Roumann and T.V. John are governed by a specific, written contract. T.V. John has relied on that premise and the deadline for amending pleadings has long past. Plaintiffs cannot now be allowed to shift this fundamental basis for their claim.

### B. T.V. John did not offer to modify the contract.

Passing Plaintiffs' failure to plead modification, they haven't proven it either.

Contracts are modified in the same manner they are created: offer and acceptance. *Kohlenberg v. Am. Plumbing Supply Co.*, 82 Wis. 2d 384, 392-93, 263 N.W.2d 496 (1978) Moreover, "[t]he acts relied upon to modify a prior contract must be unequivocal in character[.]" *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 853 (7th Cir. 2005); *see also Nelsen v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 90 N.W.2d 123, 134 (1958).

Plaintiffs' "modification" argument presumes that T.V. John's letter dated August 21, 2017 constituted an offer to modify the contract and, specifically, to pay commissions and "pursue additional profitable projects with Menards, The Fresh Market, and Kroger" if plaintiffs would comply with certain demands made in that letter. But that letter simply will not bear any such interpretation. For example, nowhere in that letter is there any demand to refrain from competition. (Resp. SAF 19.)[1] Nor is there any promise to pay Roumann more than the written agreement provided if it refrained from competition (or did anything the letter actually did demand). There was no offer to modify, period.

---

[1] References to Resp. SAF are to T.V. John's Reply to Plaintiffs' Statement of Additional Facts filed with this brief.

### C. Moreover, Plaintiffs immediately rejected the (supposed) offer to modify the contract.

Even if we somehow construe T.V. John's August 21, 2017 letter as an offer to modify the contract, Plaintiffs overlook the undisputed fact that, far from "accepting" these "new terms," they immediately *rejected* them. In a letter dated August 22, 2017, Roumann's counsel advised T.V. John that Roumann disputed that T.V. John could impose new terms, that the "conditions/restrictions on Roumann's right to entitlements contained in the Agreement is not contained therein" and that "discontinuance of payment will be interpreted by Roumann as a breach of the Agreement by the Company." (Resp. SAF 20.) Indeed, Roumann did go on to interpret T.V. John's conduct as a breach, and filed this lawsuit on October 13, 2017. (Dkt. No. 1.)

It is difficult to imagine a more emphatic and immediate rejection of the supposed modification to the Agreement than Roumann's immediate written rejection and subsequent lawsuit. And once a party has rejected the other's offer, it cannot thereafter unilaterally revive and accept it. *Cass v. Haskins,* 154 Wis. 472, 474, 143 N.W. 162 (1913) ("The general rule is that, where an offer is made and refused, the transaction is closed, and the party refusing cannot by changing his mind create a contract or obligation against the protest of the party making the offer.")

### D. Aside from that express rejection, Roumann's own actions failed to fulfill the terms of the supposed offer to modify.

Not only did Roumann expressly reject the demands set forth in the supposed offer to modify in writing, but its undisputed subsequent conduct failed to fulfill those terms. Among other things: in this very case Roumann sued Kroger, a customer; Roumann filed liens against ongoing projects T.V. John was performing for Kroger, which adversely impacted the

4

profitability of those projects (PFF 60) [2]; Roumann solicited T.V. John's employees and hired two of them during the pendency of this case (Resp. SAF 20); and Roumann competed (and continues to compete) against T.V. John, including successfully bidding against T.V. John on projects for Kroger. (PFF 64, 89.) Roumann's conduct, just like T.V. John's, is completely at odds with the terms of the supposed modification.

### E. At the end of the day, the supposed modification does not expand the damages to which Plaintiffs may be entitled.

Ignoring all these other defects, the simple fact of the matter is that the terms of the supposed modification still provide no basis for recovering the extra-contractual categories of damage now sought. The Plaintiffs do not contend that the contract was modified to include the laundry list of entitlements now claimed. The supposedly modified agreement, like the written Independent Contractor Agreement before it, does not call for payment of anything more than commissions in the amount of 30% of Net Profit Realized. There is no claim that the contract was modified to entitle Roumann to be involved in all post-termination projects, to be paid the "historical average" of profits from 2016 and 2017 or a particular profit margin, or to be paid for services that Roumann did not actually render.

For all the foregoing reasons, the Plaintiffs' entitlement to relief (if any) must be determined on the basis of the contracts *as written*, and not under some supposedly modified version of them.

## II. Nor Does the Implied Duty of Good Faith and Fair Dealing Expand the Relief Available Under the Negotiated Terms of the Independent Contractor Agreement.

According to Plaintiffs, the implied duty of good faith and fair dealing required T.V. John to "bid and obtain work and profitably perform that work" after it terminated the agreement with

---

[2] References to PFF are to T.V. John's Statement of Proposed Material Facts. (Dkt. 81).

5

Case 2:17-cv-01407-LA    Filed 10/21/19    Page 5 of 16    Document 97

Roumann. T.V. John's supposed failure to do so resulted in fewer and less profitable jobs, resulting in less post-termination compensation. (Resp. Br. 20.)

The threshold problem with this argument is the undisputed fact that, after T.V. John terminated its agreement with Roumann, it *did* bid projects, *did* obtain projects, and *did* generate revenue from those projects (which, in turn, have generated and will generate Net Profit Realized). (Resp. PFF 28, 30, 50.) Roumann's actual complaint is that, in Roumann's unilateral estimation, T.V. John did not bid *enough* projects, earn *enough* profit, or otherwise perform as profitably as Roumann believes it would have performed had T.V. John not terminated the Agreement (or, at least had T.V. John re-engaged Roumann after termination).

Unfortunately for Plaintiffs, T.V. John's supposed failure to meet Roumann's subjective standard of profitability does not constitute a breach of the implied duty of good faith and fair dealing.

### A. The performance standards envisioned by Plaintiffs are irreconcilable with the express provisions of the Independent Contractor Agreement.

Wisconsin's implied duty of good faith and fair dealing is a gap filler that "applies most urgently to unforeseen circumstances that arise during the performance of a contract . . . ." *U.S. Plastic Lumber, Ltd. v. Strandex Corp.*, No. 02-C-211-C, 2003 WL 23144861, at *11 (W.D. Wis. Feb. 7, 2003). It cannot override a contract's express terms. *E.g., Wis. Nat. Gas Co. v. Gabe's Constr. Co., Inc.*, 220 Wis. 2d 14, 582 N.W.2d 118, 121 (Ct. App. 1998). The supposed post-termination performance standards Plaintiffs now seek to impose would do just that.

The notion that T.V. John should be liable to Plaintiffs for the supposed gap between the 30% of the actual Net Profit Realized it will eventually receive and that Plaintiffs speculate it would have received had it performed as well as Plaintiffs think it should have is utterly incompatible with the Agreement. The Agreement gave T.V. John an unconditional right to

terminate Roumann. Following termination, Roumann only had the *obligation* (not the right) to be involved in ongoing projects, but only if the parties agreed on mutually acceptable terms (they did not). (PFF 33, 39.) Moreover, the contract specified precisely what Roumann's post-termination compensation would be: 30% of Net Profit Realized – not "Net *Possible* Profit, not "Net Ideal Profit," and not even "Net Profit" unqualified – but Net Profit *Realized*, that is, net profit that T.V. John *actually receives* from the client less costs.

Thus, not only is "there is no contractual gap to fill through application of the good faith doctrine," *U.S. Plastic Lumber,* 2003 WL 23144861, at *11, but reading the duties suggested by Plaintiffs into the contract would actually defeat its terms. The implied duty of good faith and fair dealing may not be misused to achieve such a result.

### B. There is no evidence T.V. John engaged in bad faith or unfair dealing.

The implied duty of good faith and fair dealing is designed to protect parties from "intentionally and purposefully" destroying the intended benefit of the bargain. *Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660, 661 (1969). Good faith focuses on motive. *Greer Props., Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 461 (7th Cir. 1989); *compare Northern Crossarm, Inc. v. Chem. Specialties, Inc.,* 332 F. Supp. 2d 1181, 1188 (W.D. Wis. 2004) (duty violated where supplier destroyed the purpose of the contract which was to preserve plaintiff's competitive advantage in the region by entering into a sublicensing agreement with a third party enabling that party to sell chemicals in the plaintiff's territory) *with Town of Neenah Sanitary Dist. No. 2 v. City of Neenah*, 2002 WI App 155, ¶ 15, 256 Wis. 2d 296, 647 N.W.2d 913 (sanitary district's withholding of consent to extend sewer lines did not violate duty of good faith despite "spirit of regional cooperation" agreement). Thus, while a party who actively destroys the purpose of a contract may be found to have violated the duty, a party who merely exercises its rights and performs, does not. *Town of Neenah Sanitary Dist. No. 2*, 2002 WI App 155, ¶ 14 (refusing to

7

find a material issue of fact concerning good faith on summary judgment, "we nonetheless conclude that the . . . inference of bad faith (or a material issue of fact on that question) . . . is too much of a stretch.")

Roumann identifies no facts that support a finding, or even an inference, that the supposed inadequacy of T.V. John's post-termination bidding and project performance was the result of its "intent[] and purpose[]" to destroy the benefit of the bargain to Roumann. Indeed, the very contention is illogical. It was in T.V. John's own self-interest to win as many projects as possible and to perform them as profitably as possible; under no construction of the contract would losing projects or performing them less profitably have resulted in more money in T.V. John's pocket than if it won as many projects or performed as profitably as Plaintiffs believe it should have.[3] And, in fact, upon terminating the Agreement, T.V. John continued bidding, winning, and performing new projects, (PFF 28, 30, 50), albeit hampered by Roumann's competition with it. (PFF 64, 89.) Eventually, the profits generated from those projects will result in Net Profit Realized, 30% of which will go to Roumann.

Nor does the fact that T.V. John elected not to involve Roumann in post-termination projects, (*see* Resp. Br. 6-11), constitute bad faith. The contract specifically contemplates that the parties would no longer be working together post-termination. *See* Section I.(H)(i) of T.V. John's opening brief. The "cooperation clause" at Section 4.2 of the Agreement does not mandate that T.V. John work with Roumann; it only dictates that, *if* the parties cooperated on ongoing projects, it would need to be on "mutually agreeable terms." (PFF 33.) And in any event, T.V. John's decision not to involve Roumann was based on its conclusion that Roumann, with whom one major client, Menards, had already refused to work, (PFF 50), and who had

---
[3] At the same time, there is no scenario under which Roumann would receive more than T.V. John – yet, ironically, that is what Roumann now seeks.

engaged in other problematic behavior, would be counterproductive. (PFF 52.) Plaintiffs may disagree with T.V. John's evaluation of their own utility, but there is no evidence that the evaluation was not sincerely held.

At the end of the day, Roumann's claim for breach of the duty of good faith and fair dealing really amounts to nothing more than a "negligent performance" claim based on standards found nowhere in the contract and supported by nothing other than Roumann's bald assertions. (*See, e.g.*, Resp. Br. 8-9 (Roumann "left big shoes to fill"; T.V. John should have won a higher percentage of bids; one of T.V. John's employees "lack[ed] . . . follow-through"); Resp. Br. 24 (T.V. John "failed to ask for help [from Roumann] when it desparately needed it")). Even assuming such extra-contractual standards were both supported by admissible evidence (they are not) and may be asserted despite this Court's previous exclusion of tort claims (they may not), nothing about T.V. John's supposed failings remotely resembles the requisite intentional, purposeful destruction of the benefit of the bargain needed to demonstrate bad faith. If anyone was guilty of bad faith, it was Roumann, whose post-termination bidding against T.V. John for jobs, winning jobs, and filing liens against property owned by clients hampered the latter's profitability.

### III. Once the Analysis is Confined to the Contract as Written, the Basis for All Damages Except 30% of Net Profit Realized Evaporates.

#### A. "Benefit of the bargain" and "expectation" damages must be rooted in the bargain as written, and not on Plaintiffs'' unilateral expectations.

Instead of responding to T.V. John's detailed, category-by-category refutation of its alleged damages, Plaintiffs broadly portray them all as "benefits of the bargain." (Resp. Br. 26-27.) But as T.V. John demonstrated in its opening brief, the vast majority of these alleged damages are based on the supposed "breach" of duties and performance metrics found nowhere in the Agreement. To adopt them would render meaningless both T.V. John's unqualified right

9

to terminate the Agreement, and the contractual definition of "Net Profit Realized." (*See* Opening Br., 15-20.) This, the Court must not permit. *See Southern Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 743 (7th Cir. 2014) ("Except in the most extraordinary circumstances, we hold sophisticated parties to the terms of their bargain."); *ConFold Pacific, Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 955 (7th Cir. 2006) ("Especially when dealing with a substantial contract between commercially sophisticated parties . . . who know how to say what they mean and have an incentive to draft their agreement carefully, there is great merit to the rule that the meaning of an unambiguous contract is a question of law rather than fact, with the consequence that unambiguous contractual language must be enforced as it is written.") (internal citations omitted).

Roumann is not entitled to a benefit which it did not bargain for. As explained already and summarized briefly below, there are no disputes of material fact as to what the contract actually says, nor of benefits actually conferred.[4]

### B. The Counterclaims Having Been Resolved, Roumann is Entitled to 30% of Net Profit Realized Once it is Confirmed – and nothing more.

In light of the Court's Decision and Order on the parties' cross-motions for summary judgment as to the counterclaims, T.V. John recognizes that Roumann is entitled to 30% Net Profit Realized as defined by the Independent Contractor Agreement.[5] (Dkt. No. 86.) However, for the reasons already discussed, 30% of Net Profit Realized cannot yet be determined. Thus,

---

[4] It is true that T.V. John has not yet deposed the three experts disclosed by Plaintiffs in May. The Court has not set a deadline to complete expert discovery, and deposing experts who advance categories of damages that are not recoverable would be a waste of resources before the Court rules on this motion.

[5] Plaintiffs complain that T.V. John did not pay to Roumann 30% of Net Profit Realized upon receipt of the Court's Decision and Order. (Resp. Br. 24-25.) However, Net Profit Realized is not yet known (as Plaintiffs acknowledge) and Plaintiffs are overly secured in knowing it will be paid – T.V. John deposited $550,000 with the Court – far more than that which will be due.

T.V. John has no current obligation to pay the commissions, and its failure to do so does not constitute a breach.

### C. As to the remaining categories of damages sought, Roumann has failed to tie its expectations to any contractual duty, despite T.V. John's challenge to do so.

Although the *computation* of damages is typically a finding of fact, the *measure* of damages upon which a factfinder may compute damages is a question of law. *Ludyjan v. Cont'l Cas. Co.*, 2008 WI App 41, ¶ 6, 308 Wis. 2d 398, 747 N.W.2d 745. As described in the opening brief, with the exception of 30% Net Profit Realized, the damages sought in this case cannot be recovered as a matter of law because each category of damage sought is premised on the "breach" of non-existent contract terms. That this is so can readily be seen by revisiting each of Roumann's damage categories.

#### 1. Profits which supposedly could have been generated from new opportunities had T.V. John not terminated the Agreement ($3,975,288).

This category seeks net profit that could have been realized had T.V. John not exercised its right to terminate the Agreement. But Roumann did not explain that T.V. John's termination of the Agreement constituted a breach. Thus, Roumann had no reasonable expectation of such profits. By its terms, either party could terminate the Agreement on 30 days' notice. (Opening Br., 18-20.) Roumann has no more right to profits after that time than it would have had this been a fixed-term contract.

#### 2. Hourly work and project oversight work Roumann never performed, but that might have been performed if T.V. John had not exercised its right to terminate the Agreement ($90,000 and $173,600, respectively).

Here again, T.V. John had a contractual right to terminate the Agreement. Roumann's expectations for post-termination payments are clearly specified in the Agreement – it is entitled to 30% of Net Profit Realized, and only that amount. It is undisputed that the Agreement confers

no right to hourly payments for work Roumann never undertook, and therefore, these damages are not recoverable as a matter of law. (Opening Br., 15.)

### 3. The historical average of Net Profit Realized Roumann earned in 2016 and 2017 ($1,710,965).

The Agreement contains no right to such a windfall for Roumann or for present payments calculated as a function of prior years – it is antithetical to the very definition of Net Profit Realized. (Opening Br., 16.)

### 4. Net Profit Realized recalculated based on what Roumann believes the project costs should have been, as opposed to actual costs (unspecified).

The Agreement's definition of Net Profit Realized is grounded in objective facts – the actual financial performance of a project. ("Net Profit Realized shall equal the total amount received from the client on the Commissioned Project less all direct costs of the project and less an overhead fee . . .") (PFF 19.) Roumann is not entitled to recovery of 30% of net profit which Roumann believes could have been realized under optimum conditions. (Opening Br., 17-18.)

### 5. Business disruption losses ($5,988,379).

The Agreement specifically gave either party the unqualified right to end the Agreement upon 30 days' notice. Therefore, there can be no liability derived from the consequences of that contractual right. Some "disruption" from termination was inevitable, and is not recoverable. (Opening Br., 18-19.)

### 6. Three unpaid invoices.

Although the parties disagree as to whether payment is due on the three invoices submitted by Roumann immediately preceding its lawsuit. (Opening Br., 14-15; Resp. Br. 25-26.) But the underlying facts are not in dispute, so the invoices may be resolved through interpretation of the Agreement and a mechanism by which the Court can be saved from

proceeding with unnecessary trials, particularly where, as here, the Court is the factfinder.  Fed. R. Civ. P. 56(f).

### a. The remainder of Invoice 12 ($2,208.18).

It is undisputed that T.V. John did not pay $2,208.18 of Invoice 12 because it deemed it not reasonable or necessary to book a last minute flight and not request a refund, and because Roumann never explained why the flight was booked late and not cancelled.  (PFF 93-96.)  None of these facts are in dispute, and the Court can determine as matter of law whether T.V. John possessed the discretionary right not to pay it.

### b. Invoice 13 ($15,690.00).

It is undisputed that T.V. John did not pay Invoice 13, which was in the amount of $15,690.00.  (PFF 97.)  T.V. John did not pay it because, unlike all prior invoices before it, Roumann did not provide substantiation of the work in the form of a time card, receipts, or other support.  (PFF 97.)  Roumann does not dispute that the support was not provided.  (PFF 99; Resp. PFF 99.)  Thus, the Court can determine as a matter of law whether T.V. John was entitled not to pay the invoice.

### c. Invoice 14 ($45,000).

It is undisputed that Roumann's Invoice 14 did not seek services rendered, but instead the "release" of the $45,000 T.V. John is entitled to maintain as an aggregate reserve.  (PFF 100.)  Interpretation of the Independent Contractor Agreement's provisions concerning the reserve – that "T.V. John is allowed to maintain an aggregate reserve of up to $150,000 on all uncompleted Commissioned Projects" – is appropriate for summary judgment.

## IV. Neither Contract Provides Roumann with any Basis for Recovering Damages for Injury to Reputation or the Like.

In an attempt to circumvent the general unrecoverability of reputation damages in commercial contracts and the Court's denial of its request to assert tort claims, Roumann claims that it is not subject to the limitation because it was an "employee" and as a result, it is entitled to recover damages for "permanent injury to professional reputation and loss of career development opportunities." (Resp. Br. 28.) Neither of the two contracts to which T.V. John was a party support this conclusion.

First, although the 2012 Offer of Employment was an employment agreement, Roumann was not a party to it. The Independent Contractor Agreement is an independent contractor agreement between two commercial entities, T.V. John and Roumann Consulting, Inc. (PFF 13.) The only damages sought by the actual employee, Rousse, consist of a claim that T.V. John improperly charged overhead to projects subject to that Agreement. The defects in that latter assertion are discussed below in Section V. Suffice it to say that the 2012 Offer of Employment grants no rights to Roumann.

Conversely, although Roumann is a party to the Independent Contractor Agreement, Article V of that Agreement contains the express acknowledgement that Roumann was an independent contractor, and that nothing contained in the agreement shall be construed to create an employer/employee relationship between T.V. John and Roumann, or any of Roumann's employees (including Rousse). (*E.g.* Resp. SAF 12.)

For these reasons, Roumann has no right to recover reputational or consequential damages.

## V. Rousse's Individual Claims are an Afterthought, Wholly Lacking in Independent Merit.

In T.V. John's opening brief, it explained why it was proper under the 2012 Offer of Employment to charge overhead to the projects. (Opening Br., 27-28.) Although Rousse dedicates two passing paragraphs at the end of plaintiffs' response to creating a dispute of fact on this point, he fails to dispute that management and accounting costs were a component of overhead and the general conditions of the contract, and admits that the general conditions were established at the beginning of each project. (See PFF 102 and Resp. PFF 102.) These concessions establish the only material facts necessary to dismiss the claim; any other dispute is immaterial.

Just as important, Rousse fails to show why he had not waived this claim and/or should not be estopped from asserting it. Indeed, Rousse admits that, even though he asked T.V. John multiple times to agree to his interpretation for establishing overhead, T.V. John did not agree. (*See* PFF 105-107; Resp. PFF 105-107.) Rousse further admits that he continued to invoice projects in amounts that accounted for the overhead charges and accept payment of those invoices from T.V. John. (*Id.*) And, while Rousse argues that he should be entitled to accept what he believed were erroneous payments while at the same time disputing them, he cites no authority in support of this proposition. Rousse's transmission of invoices taking account of overhead and his acceptance of payments based on them constituted waiver and estoppel as a matter of law.

## CONCLUSION

Plaintiffs' only legitimate expectation of future benefit consists of 30% of Net Profit Realized, as defined by the parties written agreement on the contracts accepted by T.V. John during the term of the Agreement. However, as of today that total cannot yet be determined, nor

15

can T.V. John be faulted for not paying it. All other claimed damages are devoid of basis. For these reasons, T.V. John respectfully requests the Court enter an order holding open only the remaining issue of calculating Net Profit Realized pending completion of the remaining projects subject to the Independent Contractor Agreement and otherwise dismissing each of Plaintiffs' remaining claims, with prejudice.

Dated this 21st day of October, 2019.

By: */s/ Andrew S. Oettinger*  
Andrew S. Oettinger  
State Bar No. 1053057  
Christie B. Carrino  
State Bar No. 1097885  
Godfrey & Kahn, S.C.  
833 East Michigan Street, Suite 1800  
Milwaukee, WI 53202-5615  
Phone: 414-273-3500  
Fax: 414-273-5198  
Email: aoettinger@gklaw.com  
ccarrino@gklaw.com

*Attorneys for Defendant T.V. John & Son, Inc.*