# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROUMANN CONSULTING INC. and**
**RONALD ROUSSE,**
            **Plaintiffs,**

      **v.**                             **Case No. 17-C-1407**

**T.V. JOHN & SON, INC.,**
            **Defendant.**

---

## DECISION AND ORDER

Roumann Consulting Inc. and Ronald Rousse allege that T.V. John & Son, Inc. ("TVJ") failed to pay commissions and other amounts due under an employment contract and an independent contractor agreement. In a prior order, I decided the parties' cross-motions for summary judgment on TVJ's counterclaims and dismissed the counterclaims. *See* ECF No. 86. Before me now is TVJ's motion for summary judgment on certain aspects of the plaintiffs' claims.

## I. BACKGROUND

TVJ is a construction general contracting firm that is organized under the laws of Wisconsin and headquartered in Wisconsin. Roumann Consulting is a Canadian company that provides bidding and management services for construction projects. Ronald Rousse, a citizen of Canada, is Roumann's sole owner. Although Roumann is a distinct legal entity, I will often refer to Rousse and Roumann interchangeably and/or collectively as "Rousse" because the acts of Roumann that are relevant to this suit were performed by Rousse.

In late 2011, before Rousse formed Roumann Consulting, TVJ hired Rousse as an employee. At that time, Rousse had relationships with various "light commercial" construction customers, including The Kroger Company and Menard, Inc. By hiring Rousse, TVJ gained access to these customers and was able to expand its business in the light-commercial construction market. On February 16, 2012, Rousse signed a letter from TVJ outlining the terms of his employment. *See* ECF No. 12-1. The letter stated that Rousse would be paid an annual salary and a commission of 30% on the gross profits earned on new business that Rousse brought to TVJ. For purposes of its motion for summary judgment, TVJ concedes that the employment letter created a contract. Thus, I will refer to the employment letter as a contract.

Several years later, the parties converted Rousse from an employee to an independent contractor. Rousse formed Roumann Consulting, and on March 26, 2015, TVJ and Roumann entered into an independent contractor agreement. (This agreement appears in the record multiple times; I will cite to the version at ECF No. 17-1.)

Under the independent contractor agreement, Rousse was to pursue work for specific clients—Menards, Kroger, The Fresh Market, and L.A. Fitness—and assist with the management of construction projects for those clients. In exchange, TVJ agreed to pay Rousse an hourly rate and a commission of 30% of the net profits realized on each project. *See* Agreement § 6.1 & Ex. A. TVJ also agreed to reimburse Rousse for his travel expenses. *Id.* § 6.2. The agreement contained detailed provisions governing how commission payments would be calculated and paid. TVJ agreed to pay Rousse "a commission in the amount of thirty percent (30%) of the Net Profit Realized, as later defined, by [TVJ] for projects solicited by [Rousse] during the term of this Agreement."

*Id.* Ex. A. The agreement defined "Net Profit Realized" as "the total amount received from the client on the Commissioned Project less all direct costs of the project and less an overhead fee of $7,000 per Commissioned Project provided that in any year the total amount of overhead for Commissioned Projects shall not exceed $110,000." *Id.* The agreement also granted TVJ the right to "maintain an aggregate reserve of up to $150,000 on all uncompleted Commissioned Projects which would reduce the estimated Net Profit Realized by up to $150,000." *Id.* Finally, the agreement provided that if TVJ incurred warranty work within one year of making the final payment on a commissioned project, Rousse's commissions would be reduced by 30% of the cost of the warranty work. *Id.*

The parties performed under the independent contractor agreement for some time. In August 2017, TVJ decided to terminate the agreement. The agreement allowed either party to terminate it for any reason on 30 days' written notice. Agreement § 4.1. However, it provided that if TVJ terminated the agreement for any reason other than "Willful Misconduct," TVJ was obligated to continue making commission payments to Rousse on projects related to the clients he brought to TVJ that TVJ accepted either while the agreement was in force or during the two-year period following the agreement's termination. *Id.* § 4.2(b). As I explained in my decision on the parties' cross-motions for summary judgment on TVJ's counterclaims, TVJ did not terminate the agreement for willful misconduct. Therefore, TVJ was required to make post-termination commission payments relating to the specified projects.

On August 21, 2017, TVJ sent a letter to Rousse providing notice of the termination, which would become effective on September 20, 2017. In the letter, TVJ

directed Rousse to "cease work immediately." ECF No. 17-2. TVJ also advised Rousse that it intended to make post-termination commission payments as required by the agreement. It then wrote the following:

> It is in our mutual interest for TVJ to continue to book profitable projects with the clients identified above [*i.e.,* Menards, Kroger, L.A. Fitness, and The Fresh Market]. Therefore, we expect that you will not disparage TVJ or Symbiont [TVJ's affiliate] nor interfere with any of their respective contracts. We also expect that, during the period in which Roumann continues to receive commissions, you will not solicit any employee of TVJ or Symbiont for employment with Roumann or any other business entity with which you may be associated. If you or anyone acting on behalf of Roumann disparages TVJ or Symbiont, interferes with TVJ or Symbiont contracts, or solicits their employees, commission payments will cease immediately and legal remedies will be considered. We intend to inform TVJ personnel, with whom you have worked, not to comment on this matter other than to say we have "parted ways amicably."

ECF No. 17-2 at 1.

On August 22, 2017, Rousse responded to TVJ's letter through his solicitor and acknowledged the termination. Rousse reminded TVJ of its obligation to pay post-termination commissions and expressed his concern "that future profits associated with current and future projects will be significantly eroded without the ongoing involvement and expertise of Roumann in these projects." ECF No. 73-3 at p. 3 of 4. Rousse pointed out that the termination provisions of the independent contractor agreement contain a cooperation clause, which provides as follows: "The parties hereto shall cooperate with each other to complete any ongoing projects, upon terms mutually agreeable to the parties." Agreement § 4.2(g). Rousse asked TVJ to "agree and confirm a procedure [that the parties would use] to satisfy their respective obligations" under the cooperation clause. ECF No. 73-3 at. p. 3 of 4. In this letter, Rousse also responded to TVJ's threat to discontinue commission payments if he solicited TVJ's employees. He explained that

while it was not his intention to solicit employees, he believed that the agreement did not prohibit him from doing so. ECF No. 73-3 at p. 4 of 4. Rousse stated that he would view any discontinuance of commission payments as a breach of the agreement. *Id.*

On August 31, 2017, TVJ responded to the letter from Rousse's solicitor. TVJ addressed several topics, including Rousse's concern that profits would be eroded if he was not involved with the current and future projects on which he was entitled to post-termination commissions. It wrote:

> TVJ is confident that it will be capable of profitably completing current and future projects without involvement from Roumann. We will not change our pattern of operations from past practices. As such, Roumann will receive cost reports, upon request, and will receive a commission report on a monthly basis. If in its sole discretion, TVJ determines that it needs Roumann's assistance, then Mr. Rousse will be contacted and would be expected to cooperate. In that circumstance, TVJ would give Mr. Rousse an allotment of hours to accomplish the task and would pay him his hourly rate according to our Agreement. Mr. Rousse may be needed for the Menard's Indianapolis East mediation/resolution and we will contact him if the need arises.

ECF No. 17-3 at 2.

On September 22, 2017, TVJ made a payment to Rousse for services rendered prior to the agreement's termination. A short time later, Rousse and Roumann commenced the present action. The original complaint alleged a count for breach of contract and a count for breach of the implied duty of good faith and fair dealing. These counts claimed damages for TVJ's failure to pay certain invoices that Rousse had submitted (known as Invoices 12, 13, and 14), its failure to cooperate with Rousse to complete ongoing projects, and its failure to properly manage projects that Rousse had secured prior to his termination. The plaintiffs later amended the complaint to allege that TVJ breached the independent contractor agreement by failing to pay post-termination

commissions and by withholding $45,000 in commission payments in the aggregate reserve. The amended complaint also alleged that TVJ breached the employment contract that preceded the independent contractor agreement by charging company overhead to certain projects and thus reducing Rousse's commissions.

TVJ now moves for partial summary judgment on certain issues. TVJ agrees that because I dismissed its counterclaims, Rousse is entitled to post-termination commission payments on projects for Kroger, Menards, and the other clients that Rousse brought to TVJ. But TVJ moves for summary judgment to eliminate other categories of claimed damages.

First, TVJ seeks summary judgment on Rousse's clam that he is entitled to damages for "profit erosion." Here, Rousse claims that, after he was terminated, TVJ failed to properly bid on new projects for Kroger, Menards, and The Fresh Market and that it incompetently managed the projects for those clients that Rousse had secured prior to his termination. Rousse contends that TVJ's conduct caused it to earn fewer profits than it would have had Rousse still been with the company and been the one bidding on and managing projects. Rousse notes that because the independent contractor agreement entitles him to 30% of TVJ's profits on projects for Kroger and the like, TVJ's alleged reduced profitability caused him to receive lower commission payments than he would have had he still been associated with TVJ. Rousse contends that TVJ's reduced profitability constituted either a direct breach of the independent contractor agreement or a breach of the implied duty of good faith and fair dealing.

Second, TVJ moves for summary judgment on Rousse's claim for hourly work and project oversight work ($90,000 and $173,000, respectively) that Rousse never

performed, but which he claims he would have performed had TVJ not terminated the agreement.

Third, TVJ moves for summary judgment on Rousse's claim for damages for "business disruption" and for damage to his reputation.

Fourth, TVJ seeks summary judgment on Rousse's claim that TVJ breached the independent contractor agreement by failing to pay Invoices 12, 13, and 14 in full. TVJ paid Invoice 12 in part, but it refused to pay $2,000 of that invoice, which related to an airline ticket Rousse purchased but never used. TVJ refused to pay Invoice 13 because Rousse did not include documentation with the invoice that supported the itemized charges. Invoice 14, in the amount of $45,000, represents 30% of the $150,000 aggregate reserve that the independent contractor agreement allowed TVJ to maintain on uncompleted projects. TVJ refused to pay this invoice because, at the time it was submitted, the commissioned projects were not complete and therefore TVJ was entitled to maintain the reserve.

Finally, TVJ seeks summary judgment on Rousse's claim that TVJ violated the employment contract that preceded the independent contractor agreement by charging company overhead to Rousse's commissioned projects without his consent. Rousse contends that the commission structure outlined in that contract did not permit TVJ to charge overhead unless the parties agreed to the overhead charges at the beginning of each project.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable finder of fact could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## A.    Profit Erosion

As I discussed in the background section, the independent contractor agreement provides that Roumann is entitled to 30% of the net profit realized by TVJ on certain projects that TVJ accepted either during the term of the agreement or during the two years following the agreement's termination. Agreement §§ 4.2(b), 6.1 & Ex. A. The agreement contains a method for calculating net profit realized, and the starting point for the calculation is "the total amount received from the client" on the project. *Id.* Ex. A. TVJ describes this as a "paid when paid provision," meaning that Roumann is not entitled to a commission until TVJ receives payment from the client.

Rousse, however, contends that the agreement does not limit him to commissions calculated based on payments received from a client. In addition, he contends, he is entitled to commissions on profits that he believes TVJ would have earned had TVJ's bidding and project-management skills not declined after it terminated him. *See* Br. in Opp. at 8–11, ECF No. 90. In a nutshell, Rousse contends that his departure "left big shoes to fill," *id.* at 8, and that TVJ was unable to fill them, which caused TVJ to miss out on profits that it would have earned had Rousse still been associated with the company. Rousse contends that TVJ's failure to maintain the same level of profitability as when he was with the company qualifies as a breach of the independent contractor agreement. Alternatively, he contends that such failure

8

constitutes a breach of the implied duty of good faith and fair dealing. I consider these legal theories below.

### 1. Breach of Contract

No provision of the independent contractor agreement entitles Rousse to commission payments on profits that TVJ never earned. However, Rousse contends that the parties modified the contract at the time of his termination to create an obligation on the part of TVJ to "maximize profits on new and existing work." Br. in Opp. at 18, ECF No. 90. Although Rousse does not precisely explain what he means by "maximiz[ing] profits," he seems to mean that TVJ promised that it would win as many projects as Rousse would have won, and manage them as profitably as Rousse would have managed them, had he still been with the company. *See id.* at 8–11. This alleged modification supposedly occurred when TVJ sent its termination letter on August 21, 2017. According to Rousse, in this letter, TVJ promised to "pay commissions and to pursue additional profitable projects with Menards, The Fresh Market, and Kroger," if, in exchange, Rousse agreed to "cease work immediately, not interfere with projects, not solicit employees, and not compete with [TVJ]." *Id.* at 19.

The plaintiff does not point to language in TVJ's letter suggesting that TVJ made a promise to achieve any specific level of profitability. At most, TVJ indicated that it wanted to "book profitable projects" with Rousse's clients. ECF No. 17-2 at 1. Thus, even if this letter resulted in a modification of the contract, it did not impose an obligation on TVJ to successfully bid new projects, to bid on a certain minimum number of projects, or to earn a certain level of profit on the projects it was awarded. Thus, Rousse's "modification" theory does not support his claim for profit erosion.

In any event, a reasonable finder of fact could not conclude that the letter resulted in a modification of the contract. A modification of a contract must be established in the same way as any other contract. *Kohlenberg v. Am. Plumbing Supply Co.*, 82 Wis. 2d 384, 396 (1978). The elements of contract formation are offer, acceptance, and consideration. *Runzheimer Int'l, Ltd. v. Friedlen*, 362 Wis. 2d 100, 112 (2015). As I have already stated, the letter contains no offer by TVJ to achieve a minimum level of profitability. Moreover, the letter contains no proposal that the parties modify the contract in other respects. Rousse contends that TVJ proposed to modify the contract by directing him to "cease work immediately" rather than at the end of the 30-day notice period, by warning him not interfere with TVJ's ongoing projects, by warning him not to solicit TVJ employees, and by suggesting that he not compete with TVJ. But no reasonable factfinder could agree with him on most of these points. First, the independent contractor agreement did not guarantee Rousse any minimum number of working hours, and thus TVJ could, consistently with the agreement, direct him to cease work immediately rather than when the contract terminated in 30 days. Second, TVJ's warning Rousse not to interfere with TVJ's ongoing projects was not a proposed modification. The agreement gave Rousse no privilege to interfere, and tort law prohibits an unprivileged party from intentionally interfering with the contracts of another. *See, e.g., Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2197 Wis. 2d 606, 624 n.9 (2006). Third, TVJ's suggestion that Rousse not compete with it for projects with Kroger and the like was not a proposal to modify the contract to include a non-compete clause. Rather, it was simply TVJ's pointing out that Rousse was already

entitled to 30% of the profits that TVJ earned on such projects and that therefore he had an incentive to stand down.

I will assume, however, that a reasonable factfinder could conclude that TVJ proposed to modify the contract to include a provision that Rousse not solicit TVJ's employees. The independent contractor agreement did not contain a non-solicitation clause, yet TVJ threatened to consider legal action against Rousse if he solicited its employees. Perhaps this could be construed as an offer to modify the contract to include a non-solicitation provision (though I doubt it). Still, even if this were an offer to modify, it is clear that Rousse rejected it. In the letter Rousse's solicitor sent to TVJ on August 22, 2017, he rejected TVJ's suggestion that Rousse was prohibited from soliciting employees. ECF No. 73-3 at p. 4 of 4. He stated that if TVJ failed to pay commissions on the ground that Rousse solicited a TVJ employee, Rousse would consider TVJ to be in breach of the agreement. *Id.* Moreover, since that time, Rousse has solicited TVJ employees and become associated with two of them. Thus, the agreement was not modified to include a non-solicitation provision.

For these reasons, a reasonable factfinder could not conclude that the parties modified the independent contractor agreement to include a promise by TVJ to remain as profitable as it was when Rousse was associated with the company.

## 2.    Duty of Good Faith and Fair Dealing

Rousse next contends that TVJ's failure to "maximize profits" resulted in a breach of the duty of good faith and fair dealing that, under Wisconsin law, is implied in every contract. *See Estate of Chayka v. Santini*, 47 Wis. 2d 102, 107 (1970) (recognizing that every contract implies good faith and fair dealing between the parties). The implied duty

of good faith prohibits one party to the contract from "intentionally and purposefully" either preventing the other party from performing his part of the agreement or destroying or injuring his right to receive the fruits of the contract. *Ekstrom v. State*, 45 Wis.2d 218, 222 (1969).

The Wisconsin Supreme Court's decision in *Estate of Chayka* is regarded as a classic example of the type of conduct that violates the implied duty of good faith. *See Beidel v. Sideline Software, Inc.*, 348 Wis. 2d 360, 250 (2013). In that case, a husband and wife entered into a joint will that the court treated as a contract. 47 Wis. 2d at 105. The will provided that upon one party's death, all property would go to the other and that, upon the survivor's death, the survivor's property would go to another relative. The husband died first, and all property went to the wife. However, after the wife remarried, she transferred virtually all her property to her new husband. When the wife died, no property remained in her estate. The wife's actions complied with the letter of the will, in that any property in her estate would have been transferred according to the joint will. But by divesting herself of all her property before death, the wife violated the spirit of the agreement, which was to leave the couple's joint property to the relative named in the will. The supreme court held that these actions violated the implied covenant of good faith and fair dealing.

In the present case, Rousse contends that TVJ breached the implied duty of good faith and fair dealing by "fail[ing] to do what it said it would do to attain profits: bid and obtain work and profitably perform that work." Br. in Opp. at 20, ECF No. 90. An initial problem with this argument is that Rousse cites to no evidence in the record suggesting that, after his termination, TVJ bid on no projects, obtained no work, and

earned no profits on that work. To the contrary, Rousse cites evidence establishing that, after the agreement was terminated, TVJ bid on nine projects for Kroger and 23 projects for Menards and was awarded six of these projects. *See* Pl. Prop. Findings of Fact ("PFOF") ¶ 27. Moreover, TVJ's records show that it continues to earn profits on projects for Kroger, Menards, and The Fresh Market. *See* ECF No. 93-11 at p. 23 of 24.

Because the undisputed evidence shows that TVJ bid on work for Rousse's clients and earned profits after Rousse's termination, Rousse must be arguing that TVJ breached the implied duty of good faith by failing to bid on *enough* work for his clients and to earn *enough* profit on the work it was awarded. However, the only way such conduct could conceivably amount to a breach of the implied duty of good faith is if TVJ, out of spite, intentionally failed to bid on jobs and intentionally botched the jobs it was awarded to deprive Rousse of his post-termination commissions. Otherwise, TVJ could not have "intentionally and purposefully" interfered with Rousse's right to receive the fruits of the contract. *See Ekstrom*, 45 Wis. 2d at 222. But Rousse does not contend that TVJ acted with such intent. Instead, he contends that TVJ lacked the competence to secure the number of projects that he would have secured for the company and to manage those projects as profitably as he would have managed them. But under the independent contractor agreement, Rousse had no right to expect that, if TVJ exercised its right to terminate his services, TVJ would continue to earn profits at the same rate as it did before his termination. By his own estimation, Rousse left "big shoes to fill," and thus he should have expected that, after he left TVJ, its profits (and therefore his commissions) would decline. In any event, the contract granted Rousse no right to have TVJ earn as much profit as it reasonably could have during the post-termination

commission period. Thus, even if, as Rousse contends, TVJ's business practices caused it to earn fewer profits during this time, Rousse could not have been deprived of the benefit of his bargain.

Rousse points out that the agreement contains a cooperation clause, which provides that, after termination, "[t]he parties . . . shall cooperate with each other to complete any ongoing projects, upon terms mutually agreeable to the parties." Agreement § 4.2(g). He contends that this clause supports his argument that the duty of good faith required TVJ to contact him and "ask for help" whenever it knew that it "did not have the expertise to perform at the level that [he] had." Br. in Opp. at 23-24, ECF No. 90. I disagree. For starters, the cooperation clause applies only to "ongoing projects"; it thus does not grant Rousse a right to be consulted on bids that TVJ submitted after his termination or to participate in the management of projects that TVJ was awarded after his termination.

As to work that was in progress at the time of the termination, the cooperation clause does not grant Rousse the right to continue managing those projects. At most, it imposes a duty on TVJ to consult Rousse when it is aware of a specific issue on a project and knows that the issue cannot be resolved without his assistance. In its letter of August 31, TVJ informed Rousse that it would contact him if such an issue arose. *See* ECF No. 17-3 at 2 ("If in its sole discretion, TVJ determines that it needs [Rousse's] assistance, then Mr. Rousse will be contacted and would be expected to cooperate."). Rousse does not point to evidence suggesting that any such issue arose and that, when it did, TVJ failed to ask for his help. Instead, Rousse contends that the ongoing projects "underperformed without his involvement," meaning that they did not generate as much

profit as Rousse thought they should have generated. *See* Pl. PFOF ¶¶ 34–36. But as I have explained, the cooperation clause did not grant Rousse a right to manage the projects to ensure that profits were maximized.

Rousse also points to testimony by a former TVJ employee in which the former employee states that, when Rousse was employed at TVJ, he would "step in" and solve "issue[s] that couldn't be handled," and that TVJ did not replace Rousse with someone having similar talents. *See* Neptune Dep. at 72:19–73:8, ECF No. 93-5. This testimony does not suggest that TVJ failed to cooperate with Rousse to solve issues within his unique knowledge. It suggests, instead, that TVJ's project-management abilities suffered after Rousse was terminated. And again, the cooperation clause does not grant Rousse a right to have TVJ manage projects as competently as he would have. Thus, a reasonable factfinder could not conclude that TVJ failed to cooperate with Rousse and either directly breached the cooperation clause or violated the implied duty of good faith and fair dealing.

For these reasons, TVJ's motion for summary judgment on the plaintiffs' claim for profit erosion will be granted. The plaintiffs' claim for damages for unpaid commissions will be calculated based on the actual amounts that TVJ received from the client on a commissioned project, not on the amount that TVJ could have received had Rousse still been associated with the company.

## B.    Claim for Hourly Compensation and Project Oversight Work

TVJ next moves for summary judgment on Rousse's claim that he is entitled to $90,000 in compensation for hourly work and $173,600 in compensation for project-oversight work that Rousse could have performed had TVJ not terminated the

independent contractor agreement. In his response brief, Rousse does not directly respond to this part of TVJ's motion or explain why he believes TVJ is liable for these amounts. The only time Rousse mentions these amounts in his brief is in his statement of facts, where he states that his expert witness "opined that Roumann Consulting and Mr. Rousse are owed hourly fees of $90,000 (pre-termination) and $173,000 (post-termination)." Br. in Opp. at 14, ECF No. 90. The brief does not go on to identify a legal theory supporting his claim that he is entitled to these amounts.

Because Rousse has not developed a legal argument in response to TVJ's claim that it is entitled to summary judgment with respect to these amounts, I conclude that he has forfeited any claim for these amounts. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) (argument not developed in summary judgment response brief is waived). In any event, no facts in the record suggest that Rousse actually performed work associated with his demand for the $90,000 and $173,000 payments. As best I can tell, these amounts represent estimates of hourly fees that Rousse could have earned had TVJ not terminated the independent contractor agreement. But TVJ had a right to terminate the agreement for any reason, and thus the termination itself was not a breach entitling Rousse to damages. Perhaps Rousse means to argue that TVJ breached the agreement by directing him to "cease work immediately" rather than at the end of the 30-day notice period and that these amounts represent hourly fees that Rousse could have earned during the 30-day notice period. If so, however, Rousse has not adequately developed such an argument, and thus I reiterate that any such argument has been forfeited. Moreover, the independent contractor agreement did not guarantee Rousse any minimum number of working hours during the term of the

agreement. Instead, it provided that TVJ would ask Rousse to perform services "as agreed upon by the parties from time to time." Agreement, art. I. Thus, TVJ could, without breaching the agreement, direct Rousse to stop working immediately rather than at the end of the 30-day notice period.

For these reasons, TVJ is entitled to summary judgment on the plaintiffs' claim for the $90,000 and $173,600 payments.

## C.   Damages for Business Disruption and Injury to Reputation

Next, TVJ moves for summary judgment on the plaintiffs' claim for reputational damage and business disruption. In their brief in opposition to TVJ's motion for summary judgment, the plaintiffs do not clearly explain the basis for this claim. The plaintiffs appear to claim that damages for business disruption and injury to reputation are consequential damages associated with TVJ's breach of the independent contractor agreement. *See* Br. in Opp. at 28, ECF No. 90. However, the breach alleged in this case is TVJ's failure to pay amounts due under the agreement, and such a failure could not have improperly disrupted the plaintiffs' business or injured their reputations. Perhaps the plaintiffs mean to claim that TVJ harmed Rousse's reputation by incompetently managing the projects for his clients that he secured for TVJ. If so, however, TVJ would be entitled to summary judgment on the claim because, as I have discussed, the independent contractor agreement granted Rousse no right to have TVJ competently manage the projects following his termination.

Accordingly, TVJ is entitled to summary judgment on the plaintiffs' claim for business disruption and reputational harm.

**D.      Invoice 12**

The independent contractor agreement provided that TVJ would reimburse Rousse for travel expenses associated with his services. Agreement § 6.2. It also provided that Rousse was to submit monthly invoices for his expenses. *Id.* § 6.3. One of Rousse's invoices—Invoice 12—claimed reimbursement for an airline ticket that cost $2,208.18. This was for travel from Rousse's home in Windsor, Canada, to a TVJ job site in Indiana. However, Rousse did not take the flight because he had an ear infection and his doctor advised him not to fly. TVJ refused to reimburse Rousse for the ticket because Rousse booked the flight at the last minute and did not request a refund from the airline.

Rousse contends that TVJ breached the agreement by failing to reimburse him for the ticket. TVJ moves for summary judgment on this issue. Its argument is based on § 6.3 of the agreement, which provides in relevant part that TVJ "shall make payment to [Rousse] of all *undisputed* amounts set forth in each monthly invoice upon payment from the client." (Emphasis added.) TVJ contends that if an amount is not "undisputed," it has no obligation to pay it.

TVJ's position is not supported by the agreement's text. In § 6.2 of the agreement, TVJ promised to reimburse Rousse for expenses so long as he actually incurred them in the course of providing services to TVJ and the expenses were "consistent with [TVJ's] policies with respect to such expenses and [TVJ's] requirements with respect to the reporting of such expenses." The quoted language shows that TVJ did not have unfettered discretion to refuse to pay an expense. Instead, TVJ could refuse to pay only if the expense violated its policies or if Rousse did not properly report

it. Here, TVJ does not show that Rousse's booking the ticket but then not using it due to illness violated its policies. While TVJ seems to imply that Rousse acted in bad faith by purchasing the ticket at the last minute and then not using it, the evidence does not conclusively show that Rousse purchased the ticket *after* his physician advised him not to fly. Moreover, while TVJ notes that Rousse did not request a refund, it does not point to evidence showing that the ticket was refundable. Thus, a reasonable factfinder would not be compelled to conclude that Rousse violated TVJ's travel policies and/or acted in bad faith. TVJ is not entitled to summary judgment on this issue.

**E.      Invoice 13**

On August 28, 2017, Rousse submitted an invoice to TVJ in the amount of $15,690. The invoice states that it is for Rousse's professional services in connection with a Kroger fuel center. TVJ refuses to pay this invoice. According to Rousse, TVJ never gave him a reason for not paying the invoice. But, in moving for summary judgment, TVJ claims that it refused to pay the invoice because Rousse did not substantiate his charges by submitting time cards, receipts, and other items. Rousse, in turn, states that TVJ had never before required him to submit supporting documentation for his invoices. *See* Rousse Decl. ¶ 12, ECF No. 94. Thus, there is a genuine factual dispute over whether TVJ's policies required Rousse to submit supporting documentation with his invoices. Accordingly, TVJ is not entitled to summary judgment on this issue.

**F.      Invoice 14**

On August 28, 2017, Rousse submitted an invoice to TVJ in the amount of $45,000. This did not represent a charge for services rendered, but instead was a

demand that TVJ release $45,000 in commission payments that TVJ was holding in the "aggregate reserve" that the independent contractor agreement entitled TVJ to maintain until all commissioned projects were completed. *See* Agreement Ex. A. TVJ contends that it is entitled to summary judgment on this claim because, at the time Rousse submitted the invoice, the commissioned projects were incomplete, and therefore TVJ's continuing to maintain the reserve could not have been a breach. TVJ also notes that the commissioned projects remain incomplete and that therefore, as of today, Rousse has no right to his share of the aggregate reserve. TVJ states that it intends to pay Rousse his share of what's left in the reserve after the projects are completed.

In his brief in opposition to TVJ's motion for summary judgment, Rousse does not develop a legal argument supporting his claim that TVJ's retaining the $45,000 until all projects are complete is a breach of the independent contractor agreement. Instead, he asserts, in conclusory fashion, that his "position is that the amount is due now because T.V. John will not allow Mr. Rousse to be involved in project warranty work, which he would be able to negotiate and more competently deal with than T.V. John." Br. in Opp. at 17, ECF No. 90. Rousse does not cite a provision of the contract or any legal authority that would support his "position." Accordingly, the plaintiffs have forfeited any claim that TVJ's retaining the $45,000 until all commissioned projects are complete is a breach of the independent contractor agreement or otherwise actionable. *See Harper*, 433 F.3d at 528.

## G. Breach of Employment Contract

Finally, TVJ moves for summary judgment on Rousse's claim that TVJ breached the employment contract that preceded the independent contractor agreement by

charging overhead to commissioned projects without his consent. In the amended complaint, Rousse alleges that TVJ improperly charged "company overhead" of $25,000 to $30,000 to each of several projects for Menards. Am. Compl. ¶ 31. TVJ contends that it is entitled to summary judgment on this claim for three reasons: (1) the employment contract provided that TVJ could charge overhead to each project; (2) Rousse waived his claim that the charges were improper; and (3) Rousse is equitable estopped from now disputing the charges.

Regarding TVJ's first argument, the contract stated as follows with regard to overhead (which it describes as "management and accounting costs"):

> All TVJ Management and Accounting costs shall be established at the beginning of each project. All management and accounting costs, including a portion of your non-commission based salary (as agreed upon by Ron Rousse and Tim Nelson), will be placed within the general conditions of the project. Gross profit for a job shall be calculated by subtracting actual materials cost and labor cost from gross receipts.

ECF No. 12-1. TVJ contends that this provision allowed TVJ to unilaterally set nearly all the overhead costs that would be charged to a project, provided that it did so at the beginning of the project. According to TVJ, the only exception was the portion of Rousse's salary that would be included as overhead in each project. As to that, the contract provided that Rousse and TVJ (through Tim Nelson) were to agree on the portion of salary to charge to each project.

In his response to TVJ's motion for summary judgment, Rousse contends that "no contract provision provided [TVJ] the unilateral right to set or adjust any project cost." Br. in Opp. at 29, ECF No. 90. However, Rousse does not engage with TVJ's argument that the provision quoted above granted it the right to unilaterally determine overhead costs for each project. *See id.* By failing to develop an argument on this point,

Rousse has forfeited any claim that the provision did not grant TVJ the unilateral right to set overhead for a project. *See Harper*, 433 F.3d at 528.

However, the provision required TVJ to establish overhead costs "at the beginning of each project," and Rousse contends that TVJ did not adhere to this requirement. Instead, he contends, TVJ billed overhead to projects "freely" as the projects progressed. Rousse Dep. at 159:11–160:3, ECF No. 93-1. Thus, a genuine factual dispute exists on this point, and therefore TVJ is not entitled to summary judgment on the basis of the contract language.

TVJ contends that, even if Rousse could otherwise establish a claim for breach of the employment contract, he has waived that claim by accepting commission payments that TVJ calculated after deducting the overhead charges. Relatedly, TVJ contends that Rousse is equitably estopped from proceeding with this claim because he accepted the commissions payments and thus led TVJ to reasonably believe that he was not disputing the charges. However, TVJ's claims of waiver and equitable estoppel involve disputed factual issues. At his deposition, Rousse gave testimony that could be reasonably interpreted to mean that, although he accepted the commission payments, he consistently informed TVJ that he disputed the overhead charges. Rousse Dep. at 113:22–114:3, ECF No. 93-1. Under these circumstances, a reasonable finder of fact could conclude that Rousse put TVJ on notice that he was reserving his right to later bring a claim for breach of contract based on the overhead charges. Accordingly, TVJ is not entitled to summary judgment on Rousse's claim for breach of the employment contract.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that TVJ's motion for summary judgment (ECF No. 79) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to the plaintiffs' claim for profit erosion, meaning that commission payments must be calculated based on the amounts actually received from a client on a project, rather than on the amounts that TVJ might have earned had it more competently managed its business. The motion is also granted as to the plaintiffs' claims for hourly work, project oversight work, business interruption, damage to reputation, and failure to pay Invoice 14. The motion is denied as to Invoices 12 and 13 and the plaintiffs' claim for breach of the employment contract.

Dated at Milwaukee, Wisconsin, this 23rd day of January, 2020.

s/Lynn Adelman_____
LYNN ADELMAN
District Judge